Gerald Nolan, J.
The plaintiffs, 10 Class 1 railroads, all engaged in the business of transporting freight, or freight and passengers, in interstate commerce, in the State of New York, have brought this action for a judgment declaring sections 54-a, 54-b, and 54-c of the Railroad Law of the State of New York, commonly known as the “ Railroad Full Crew Laws ”, unconstitutional, and enjoining the defendants from enforcing them. The defendants are public officers, charged with the duty of enforcing the laws, and the intervenors-defendants are labor organizations which represent operating employees of the railroads.
Section 54-a (L. 1913, ch. 146, as amd. by L. 1921, ch. 290) provides as follows: “ No person, corporation, trustee, receiver, or other court officer, shall run or operate, or cause to be run or operated, outside of the yard limits, on any railroad of more than fifty miles in length within this state, a freight train of more than twenty-five cars, unless said train shall be manned with a crew of not less than one engineer, one fireman, one conductor and three brakemen; nor any train other than á freight *71 train of five cars or more, without a crew of not less than one engineer, one fireman, one conductor and two brakemen, and if the train is a baggage train or a passenger train actually carrying baggage, without a baggageman in addition to said crew; nor any freight train of twenty-five cars or less without a crew of not less than one engineer, one fireman, one conductor and two brakemen; nor any light engine without a car or cars, without a crew of not less than one engineer, one fireman and one conductor or bralteman.”
Section 54-b (L. 1936, ch. 777) provides that: “No person, corporation, trustee, receiver or other court officer shall run or operate, or cause to be run or operated, on any railroad within this state any fuel-electric engine, unless said engine shall be manned with a crew of not less than one engineer and one fireman or helper.”
And it is provided by section 54-c (L. 1937, ch. 903) that: “ No person, corporation, trustee, receiver, or other court officer, shall run or operate, or cause to be run or operated, on any railroad of more than fifty miles in length within this state any locomotive, engine, motor or self-propelled unit operated by any form of energy, except a multiple-unit car or cars, while engaged in switching car or cars, or transferring, as a switching movement, a car or cars from one railroad to another or from one railroad yard to another railroad yard, without a crew consisting of not less than one engineer, one fireman or helper, one conductor or foreman and two trainmen or two helpers.”
Violations of these statutes are misdemeanors.
Plaintiffs assert that the full crew laws have no reasonable relationship to the safety of the operation of their railroads or to the safety of the public or plaintiffs’ employees, and that their effect is to compel them to employ unnecessary firemen, brakemen, trainmen and baggagemen without regard to operating conditions, safety or efficiency, at a total cost of over $12,000,000 annually. The imposition of this burden, they claim, constitutes, in the absence of reasonable justification therefor, a confiscation of their property without due process of law, in violation of section 6 of article I of the Constitution of the State of New York, and of the Fourteenth Amendment to the Constitution of the United States. Plaintiffs further allege that by the enactment of these statutes the Legislature singled out the railroad industry and imposed on it alone, the requirements of the laws with respect to the minimum number of employees which must be assigned in the operation of its business, and that by so doing, and by providing by sections 54-a and 54-c that these statutes apply only to railroads of more than 50 miles *72 in length, the Legislature has denied to plaintiffs equal protection of the laws, contrary to section 11 of article I of the Constitution of the State of New York, and the Fourteenth Amendment to the Constitution of the United States. It is further claimed that the statutes under attack constitute a direct interference with and burden on interstate and foreign commerce in violation of clause 3 of section 8 of article I of the Constitution of the United States, and that because of the enactment in 1963 of United States Public Law 88-108 (77 U. S. Stat. 132; see footnote to U. S. Code [1964 ed.], tit. 45, § 157), establishing an Arbitration Board charged with the duty of making a binding award with respect to the use of firemen on other than steam-powered locomotives, and with respect to freight train and yard crew consists, and by virtue of the fact that an award has been made by the board, the full crew laws, insofar as the crew consists thereby provided for differ from the consists determined by the award, are void as repugnant to the second clause of article VI. of the Constitution of the United States, commonly known as the “Supremacy” clause.
In 'support of their claim that the full crew laws are unreasonable and arbitrary, plaintiffs, although they did not concede that the laws were valid when enacted, took the position on trial that they had made, and were continuing to make, technological improvements upon their railroads which had promoted their safety and reduced the hazards of their operation to such extent that no matter what validity the statutes might have had, their application to plaintiffs’ operations is so unreasonable and burdensome under present conditions as to constitute a deprivation of property without due process of law.
The answers of the defendants deny certain of the material allegations of the complaint, and that of the defendant Public Service Commission demands no relief but submits the issues to the court for determination. The intervenors-defendants have denied material allegations of the complaint, and have asserted several affirmative defenses which do not require discussion at this point.
Controversy concerning full crew laws and rules is not of recent origin. The first New York State full crew law entitled, “ An Act to Better Protect the Lives of Railrod Employees ”, was passed by the Legislature in 1907. The statute required on freight trains of more than 20 cars a minimum crew of six, consisting of an engineer, a fireman, a conductor and three brakemen. It was disapproved by Governor Hughes because it took no account of differences between different roads and parts qf roads ip trackage apd switching facilities, and of the fact that *73 what might he necessary in the case of some railroads might be wholly unnecessary in others. It was the Governor’s opinion that to require the expenditure of a very large amount of money without necessity for the outlay, was simply arbitrary exaction and a taking of property without due process of law. Nevertheless, a few years later the Supreme Court of the United States held that a statute of the State of Arkansas, also enacted in 1907, which prohibited the operation of freight trains with a crew of less than an engineer, a fireman, a conductor and three brakemen, regardless of any modern equipment of automatic couplers and air brakes, was constitutional, as against claims that the employment of a third brakeman was unnecessary, because there were no duties for him to perform, and that the plaintiff railroad was thereby required to expend a large amount of money for a useless purpose, and was deprived of its property without due process of law (Chicago, Rock Is. & Pacific Ry. Co. v. Arkansas, 219 U. S. 453).
Again, in 1912, a law similar to the 1907 statute passed the New York State Legislature and was vetoed by Governor Dix for reasons, except that of unconstitutionality, similar to those which had been previously stated by Governor Hughes.
Section 54-a of the Railroad Law was enacted in 1913. It was approved by Governor Sulzer. In his memorandum of approval, the Governor stated:
“ The State for its own welfare has the right to demand the employment upon the railroads of every safety appliance, whether mechanical or human, in the interest of life and limb and greater safety standards. * * *
‘ ‘ Every safeguard it seems to me should be employed by the railroads to prevent wrecks, to protect the property of shippers, and to conserve human life and limb — not only of the employees but of the traveling public. The progressive spirit of the times demands it, and the trend of present-day legislation is all that way.
“ The inauguration of these reforms, in my opinion, will create greater safety, and establish more efficiency in the operation of railway transportation ”.
Section 54-b was enacted in 1936. In approving it, Governor Lehman stated that he believed “ that the greatest care should be taken to protect human life, even though a slight additional expense has to be incurred by the railroads.”
In 1937, section 54-c was enacted, and was approved by Governor Lehman.
With the exception of a slight amendment to section 54-a in 1921, these statutes have remained unchanged since the respec *74 tive dates of their enactments, despite repeated proposals to repeal them.
In January, 1959, the Public Service Commission of the State of New York, in making a report as to the financial status of railroads operated in this State recommended legislative reconsideration of the full crew laws, and in the same year by concurrent resolution the Legislature directed the commission to undertake a comprehensive and impartial study, analysis, and investigation of the laws for the purpose of determining the relationship between such laws and the requirements of the safety of railroad operations involved, the railroad employees engaged therein, and the public. After hearings at which proof similar to that presented on the trial of this action was adduced before the commission, it reported that no justification could be found for continuing to single out the railroad industry and to subject it to unusual and extreme statutory mandates contained in the full crew laws, and that irrespective of the justification, if any, for the original enactments, there was no longer any reasonable relationship between the statutory full crew requirements and the safety of the railroad operations involved, the employees engaged therein, and the public, and that the repeal of the laws was required. The commission, however, although of the opinion that the laws were unjust, and arbitrary because of their mandatory and inflexible requirements, and that if crew consists of railroads were to be subject to control, some flexibility was essential to meet varying conditions, did not find that no necessity existed, in the interest of safety, for regulation of railroad crew consists. On the contrary, the commission was of the opinion that there were sound and compelling reasons for subjecting the judgment of railroad management in such matters as crew consist practices to the regulatory control of an agency such as the commission, and reported that the repeal of the laws would not jeopardize the safety of railroad operations or of railroad employees, or the public, since the commission, upon the event of such repeal would be free to exercise control and to prescribe such minimum crew requirements as might reasonably appear to be required in the interest of safe and adequate railroad operations and service. The commission submitted with its report and recommendation a complete transcript of the record of its hearings, including statements made and evidence presented in support of and in opposition to the laws under consideration. Presumably its recommendation was given due consideration by the Legislature, but it was not adopted. Since that time, and particularly in the last five years, legislation to repeal the full crew laws has been presented to and introduced *75 in the Legislature, and their repeal has been recommended by the Governor. Neither the Governor’s recommendation, nor the legislation introduced, has been adopted. On the other hand, attempts to persuade Congress to adopt a national railroad full crew law have been equally unsuccessful.
Insofar as firemen were concerned, there was little need for such legislation. Although firemen were unquestionably necessary members of the locomotive crew on the steam locomotive, with the advent of the diesel locomotive, their traditional ‘ ‘ firing ” duties disappeared. Since 1937, however, and until 1964, the so-called National Diesel Agreement required the use of firemen (helpers), taken from the ranks of the firemen, on main line passenger trains, and on practically all freight and yard diesel-electric locomotives. No national rule or agreement existed, however, with respect to the consist of other members of the crew. The make-up of such crew consists was provided for by a number of work rules and practices, some system-wide and some local, and by laws and regulations in some States. When this action was commenced, 16 States, including New York, had laws specifically establishing crew consist minima, and 7 other States empowered regulatory commissions to impose such minima. Three had done so.
Most of these laws were enacted before 1920, and most of the rules, regulations and practices were formulated or developed more than 30 years ago. Laws in four of the full crew States have recently been repealed, and some others have been declared invalid or unenforcible by the courts.
In November, 1959, the railroads sent notices pursuant to section 6 of the Railway Labor Act (U. S. Code, tit. 45, § 156) proposing inter alia the elimination of all agreements, rules, regulations, interpretations and practices, however established, which required the employment or use of firemen (helpers) on other than steam power, in any class of freight or yard service, and the adoption of a rule giving management the unrestricted right to determine when and if a fireman (helper) should be used in such services. The proposal did not contemplate the elimination of firemen on locomotives used in passenger service, nor, obviously, did it contemplate the elimination of full crew laws, through the process of collective bargaining. The notices also proposed the elimination of all rules, agreements, regulations, and practices fixing the size of train crews and the establishment of a rule giving management the right to determine how train crews should be made up. Obviously, again, those notices did not propose the elimination of State full crew laws affecting train crews. The employees’ organizations,' in turn, *76 served notices, in September, I960, which proposed the establishment of rules or agreements which would provide for the continuation, and extended use of firemen and would have required two trainmen and one conductor in all trains crews, plus such additional crewmen as would be required to assure maximum safety.
To settle the differences which existed, after negotiation had failed to bring about a solution, the President of the United States, pursuant to agreement between the railroads and organizations representing their employees, by order effective January 1, 1961, appointed a special commission, known as the Presidential Railroad Commission, to investigate the facts and report its findings and recommendations to the President. That commission concluded that firemen-helpers were not so essential for the safe and efficient operation of road freight and yard diesels that there should continue to be either a national rule or local rules requiring their assignment on all such diesels. With respect to train crew consists, the commission concluded that there was some overmanning in road and yard services under existing practices, but little undermanning, but that the carriers should not have unlimited discretion to determine crew consists, nor should there be a national rule freezing minimum crew consists as proposed by the employees’ organizations. The commission made certain settlement proposals, which were not accepted.
Further negotiations under the Railway Labor Act were unsuccessful. An emergency board was appointed, which also made proposals to settle the issues, but they were not found to be acceptable. The Secretary of Labor joined in the negotiations and on August 2,1963, submitted a memorandum defining the issues, and endeavoring to indicate the areas in which-agreement was possible. Plans for voluntary arbitration were proposed and rejected. A nationwide railway strike was imminent. To avert this disaster, Congress passed a joint resolution, which was approved by the President on August 28, 1963 (Public Law 88-108; 77 U. S. Stat. 132).
This enactment prohibited a strike or any change except by agreement or arbitration, as provided therein, in rates of pay, rules or working conditions encompassed by any of the notices theretofore served by the railroads or the employees’ organizations, and authorized the creation of an Arbitration Board of seven members, two to be designated by each of the contending factions, and three to be neutral members, appointed by the other four, or if they were not so appointed, to be designated by the President. The Secretary of Labor was directed to *77 furnish to the board and to the parties copies of his statement of August 2, 1963, setting forth the matters in which the parties were in tentative agreement, and the extent of disagreement with respect to other matters and the Arbitration Board was directed to make a binding award with respect to the firemen and crew consist issues as raised by the notices served by the carriers and by the employees’ organizations. The award when made was to continue in force for a period not to exceed two years unless the parties should otherwise agree. All other issues were to be decided through collective bargaining.
The board was directed in making the award to give due consideration to its effect on adequate and safe transportation service to the public and upon the interests of the carrier and employees affected, and to give due consideration to the narrowing of the areas of disagreement which had been accomplished in collective bargaining. No mention was made in the law of the State full crew statutes, or of any Congressional intent to occupy or not to occupy the field in which they operated. The board filed its award on November 26, 1963, and it became effective on January 25, 1964. The award was accompanied by an opinion by the neutral members, in which they stated that the record ‘ ‘ contained no evidence to support the charge, frequently and irresponsibly made, that firemen presently employed in road freight and yard service throughout the country are being paid for doing nothing, and actually perform no useful work. ’ ’ They noted, however, that the lookout function assigned to the fireman was also performed by the head brakeman in road freight service, and by all members of the crew in yard service. It was their opinion that in the great majority of cases the lack of a fireman to perform the related functions of lookout and signal passing would not endanger safety or impair efficiency and that a considerable portion of the mechanical duties now performed by the firemen were “not absolutely essential” to the safety and efficiency of road freight and yard operations, since these duties could be performed by the engineer while the engine was in service, and by shop maintenance personnel at other times.
It was their conclusion that although firemen were performing useful services, they were not so essential for safe and efficient operation that there should continue to be either a national rule or local rules requiring their assignment on all diesels. Nevertheless, they also found that a certain number of assignments required the continued employment of firemen ‘ ‘ in order to prevent excessive safety hazard to lives and property * * * and to secure adequate and safe transportation to the public,” *78 and considered it essential in yard service, if locomotives were to be operated without firemen, that “ dead-man” controls be installed therein. Accordingly, the board made an award which provided, with respect to firemen on other than steam power in freight and yard service, that all agreements, rules, regulations and practices, however established, shall continue undisturbed except as modified, provided for procedures designed to eliminate all but at least 10% of such fireman assignments, and directed that after 37 days the carriers should not be required to use firemen other than in crews designated pursuant to the procedure provided. The award provided, nevertheless, that with some exceptions all firemen hired more than two years prior to the effective date of the award should retain their rights to employment and seniority until death, retirement, resignation, or discharge for cause.
With respect to the crew consist issue, the board found that some overmanning existed in road and yard crews and that there was a possibility that there was undermanning on some assignments, but concluded that the consist of crews necessary to assure safety and to prevent undue work loads must be determined primarily by local conditions. Consequently they found both the proposals by the carriers and the employees’ organizations unsatisfactory and remanded the issue for local negotiation, providing that if no agreement could be reached with respect to crew consists in stated categories the issues should be decided by special boards of adjustment, and laid down comprehensive guidelines to govern the determinations of such boards. Again, as in the case of the firemen, the board provided substantially that trainmen and similar employees, other than those on furlough, should retain their rights to service assignments to the extent of available positions, and that the reduction in jobs should be accomplished only through natural attrition.
Pursuant to the award of the Arbitration Board, plaintiffs are now operating locomotives, outside the “ full crew ” States, a /ithout firemen; and in “ full crew ” States, as well as in those which have no such statutes, special boards of adjustment have met and in a number of cases have approved changes in rules which appear to permit the operation of trains with crews consisting of fewer trainmen than were required under former rules or the full crew laws. The award of the Arbitration Board has been filed as required by section 9 of the Bailway Labor Act (U. S. Code, tit. 45, § 159) and judgment has been entered thereon, despite actions brought to impeach it (see Brotherhood of Locomotive Firemen & Enginemen v. Chicago, Burlington & Quincy R. R. Co., 225 F. Supp. 11, affd. 331 F. 2d 1020, cert. den. *79 377 U. S. 918). Unquestionably the Federal statute is the supreme law of the land (U. S. Const., art. YI) and if there is a conflict between the full crew laws and the Federal statute and the award made pursuant thereto, to such extent that they cannot be reconciled or consistently stand together, the full crew laws, even though enacted in the exercise of the police power of the State, must yield. That question, as well as the other issues of law which are presented, will be discussed after a further statement of the facts which are considered to be essential.
As their history indicates, the full crew laws were enacted to promote safety in railroad operations and, insofar as due process is concerned, the questions presented involve their relationship to that legislative purpose, particularly in the light of present conditions.
Unquestionably, since their enactment, there have been numerous important improvements in railroad technology, and many changes in traffic conditions and operational procedures. One of the most important of the technological improvements has been the development of the diesel-electric and the electric locomotives, which have eliminated entirely the traditional ‘1 firing ’ ’ function of the firemen and have left them free to devote considerably more time to the performance of other duties assigned to them. Diesel-electric locomotives are used exclusively in both passenger and freight railroad operations in this State, except in certain electrified areas, where electric locomotives and multiple unit electric cars may be used. With such locomotives there are smoother starts and stops with the result that there are fewer shocks to the train and reduced discomfort and hazard to crew members and passengers. Dynamic braking has resulted in reduction of wear on brake equipment and overheating of wheels and brake shoes. Engine consists in freight operations are ordinarily made up of multiple diesel units which are better able to haul heavy tonnages on grades, eliminating the need for cutting the train into sections, and the hazards involved in the duties formerly imposed on crew members during such operations. It would inordinately prolong this statement to separately set forth the improvements made by each of the plaintiff railroads since the enactment of the full crew laws, nor is it essential to do so. It is sufficient to say, although technological improvement has not been uniform among the plaintiff railroads, in the sense that each has made the same improvements to the same extent, that the evidence establishes a consistent pattern of improvement, and that by reason thereof railroad operations are considerably safer today than they were when *80 the full crew laws were enacted. Air brake systems and coupling devices have been considerably improved. Cast iron wheels have been replaced by steel, and steel has replaced wood in the construction of freight cars and cabooses. Roller bearings have to some extent replaced the older friction type, and considerable improvement has been made in the lubrication of the friction type bearings by substituting lubricating pads for the old waste packing, thus reducing the danger of derailments caused by ‘ ‘ hot boxes. ’ ’ Rails are heavier, their length has been increased, considerable progress has been made in the installation of continuous welded rails, and their controlled cooling in the manufacturing process, and mechanized equipment is used in track maintenance. Stone ballast has been installed and roadbeds have been improved by the use of chemically treated ties. The old semaphore signal system has for the most part been replaced by the introduction of electric colored light and light position signals. Electrical hotbox detectors have been installed by some railroads, as well as dragging equipment detectors, and slide fences, all of which tend to reduce the danger of derailments. Ultrasonic devices are used to discover defects in rails and broken flange detectors have also been installed in some locations. Considerable use is made of automatic train stop devices, which operate the brakes when the engineer fails to respond to a restrictive signal, and to some extent “ dead-man ” controls have been installed in locomotives. Verticle wheel power brakes have been substituted at the ends of freight cars for the old horizontal wheel brake formerly located above the car roof, and nonspin brakes have been installed. Centralized traffic control systems have been put into operation and other improvements have been made in automatic block signals and traffic control to reduce the danger of collisions. Communication facilities have been improved by the development of telephone and radio systems permitting communication between head and rear ends of trains, from train to train, and from trains to stations. “ Walkie-talkies ” are used, in communication between train crews and trains, and telephone systems are used in train dispatching and for communication between trains and control points. Retarders are used in gravity-switching yards and progress has ben made in electronic control of yard switching operations.
The foregoing list is not complete, and as has been stated does not accurately show the extent of improvements made by each railroad. It does show, however, an impressive record of improvement in technology, which has tended to decrease substantially the hazards of railroad operation, to railroad *81 employees and the public, and lends considerable force to plaintiffs’ argument that in the light of present conditions the full crew laws are obsolete and have no reasonable relation to the safety of railroad operations.
On the other hand, the evidence establishes that the average size of freight cars, the length of trains, and the speed at which they are operated have increased. Malfunctions in safety devices, including radio equipment, and in diesel engines and equipment, are not so uncommon that they should not reasonably be anticipated, and despite the installation and use of safety devices, hotboxes and dragging equipment still constitute hazards which require constant vigilance, if they are to be detected in time to prevent accidents. Collisions, derailments and other accidents still occur despite technological advances. With respect to these accidents statistics were produced by both sides, which purported to show trends in increase and decrease of various types of accidents, in New York iState and elsewhere, during the years within which the full crew laws have been in effect. I have given consideration to that evidence, but am unable to find, in the absence of more adequate information as to the circumstances attending the accidents reported, any logical connection between the conclusions expressed, and the presence or absence of full or minimum crews on the railroad trains involved therein.
A considerable volume of opinion evidence was introduced by plaintiffs and the intervenors-defendants as to the relation between the functions performed by firemen and alleged excess brakemen in road and freight and switching operations, and the safety of the operations involved. Although it is debatable whether opinion evidence was properly admissible on the issues presented, I have given it consideration, but have not found it helpful. The witnesses who gave these opinions were well qualified, and apparently sincere in their beliefs, but they were not impartial, and to some extent the opinions which they expressed were not supported by the facts, or by the reasons given therefor. Despite evidence introduced by plaintiffs to the contrary, I find that the services performed by the firemen and the brakemen and trainmen claimed to be excessive do have a relationship to safety, and contribute to the safety of the operations in which they are engaged. That, however, is not precisely the question to be determined. What plaintiffs claim is that the contribution, if any, is so unsubstantial and cumulative that the services of these employees can be dispensed with without sacrifice of safety, and that they are compelled by the laws under attack to employ unnecessary employees at great *82 expense and are thus deprived of their property without due process. If this claim, has been established by evidence of the quality which the law demands, plaintiffs are entitled to relief. The Legislature may not, under the guise of protecting the public interest, arbitrarily interfere with or impose unreasonable restrictions on the lawful operations of the railroads (cf. Weinberg v. Northern Pacific Ry. Co., 150 F. 2d 645, 651). v. Robin, 178 App. Div. 535, 539, and American Law Institute
Although the evidence is of doubtful competency (cf. Richards Model Code of Evidence, rule 515 and comment thereon), I have considered the relevant findings of fact, including factual conclusions contained in the reports of the Presidential Railroad Commission (1962) and the Public Service Commission (1960) heretofore referred to, as well as the report of the “Royal Commission on Employment of Firemen on Diesel Locomotives in Freight and Yard 'Service, in the Canadian Pacific Railway ” (1957) as prima facie proof of the facts and conclusions stated, and have taken note of the opinions expressed. None of these commissions, however, was required to nor did any of them determine the precise question before the court in this action nor were they concerned in making their determinations with questions concerning the burden of proof which plaintiffs must sustain if they are to be successful here.
The rules of law which must be applied in determining whether plaintiffs’ claim of denial of due process has been established, have been frequently stated.
Legislation designed to provide public safety carries with it a strong presumption of validity when challenged in the courts (Bibb v. Navajo Freight Lines, 359 U. S. 520, 524) as well as a rebuttable presumption of the existence of the necessary factual support for its provisions. If any state of facts, known or which may reasonably be assumed, justifies the law, the court’s power of inquiry ends (United States v. Carolene Prods. Co., 304 U. S. 144, 152, 154). Questions of wisdom, need, or appropriateness are for the Legislature (Olsen v. Nebraska, 313 U. S. 236, 246). Courts strike down statutes only as a last resort, and only when unconstitutionality is shown beyond a reasonable doubt. But for all that, due process demands that a law be not unreasonable or arbitrary, and that it be reasonably related and applied to some actual and manifest evil which, however, need only be reasonably apprehended. And even though the police power enactment may have been valid when made, later events may show it to be arbitrary and confiscatory (Abie State Bank v. Bryan, 282 U. S. 765, 772; Defiance Milk Prods. Co. v. DuMond, 309 N. Y. 537, 541; Matter of Spielvogel v. Ford, 1 N Y 2d 558- *83 562; Wiggins v. Town of Somers, 4 N Y 2d 215, 218, 219). When the subject of legislation lies within the police power of the State, fairly debatable questions as to reasonableness are not for the courts, but for the Legislature (Ferguson v. Skrupa, 372 U. S. 726; Sproles v. Binford, 286 U. S. 374, 388, 389; Standard Oil Co. v. Marysville, 279 U. S. 582, 584; Lincoln Bldg. Assoc, v. Barr, 1 N Y 2d 413, 415).
In the only full crew cases which reached the Supreme Court of the United States, the full crew laws of Arkansas were held to be constitutional against attacks on the ground that they violated the due process and equal protection clauses of the Fourteenth Amendment, and the commerce and supremacy clauses of the United States Constitution, in that they were repugnant to the comprehensive scheme of Federal regulation provided by the Interstate Commerce Act, and in conflict with the spirit of the Railway Labor Act. The Arkansas laws required a crew of one engineer, one fireman, one conductor and three brakemen on freight trains of at least 25 cars on any railroad of at least 50 miles in length, and a crew of an engineer, a fireman, a foreman and three helpers in switching and transfer operations across public crossings within city limits (Chicago, Rock Is. & Pacific Ry. Co. v. Arkansas, 219 U. S. 453, supra; St. Louis, Iron Mountain Ry. Co. v. Arkansas, 240 U. S. 518; Missouri Pacific R. R. Co. v. Nonoood, 283 U. S. 249, 290 U. S. 600).
In sustaining the constitutionality of the statute which required three brakemen on trains of 25 cars or more against the claim that it deprived the railroad of its property without due process of law, the court stated: “ Under the evidence, there is admittedly some room for controversy as to whether the statute is or was necessary; but it cannot be said that it is so unreasonable as to justify the court in adjudging that it is merely an arbitrary exercise of power and not germane to the objects which evidently the state legislature had in view. It is a means employed by the State to accomplish an object which it is entitled to accomplish, and such means, even if deemed unwise, are not to be condemned or disregarded by the courts, if they have a real relation to that object.” (Chicago, Rock Is. & Pacific Ry. Co. v. Arkansas, supra, p. 466.)
Plaintiffs do not complain, of course, that firemen were unnecessary employees when section 54-a of the Railroad Law was adopted in 1913, and in view of the nature of the issues presented in this action and the provisions of sections 54-b and 54-c it is not necessary to determine whether section 54-a, which was enacted in the era of the hand-fired steam locomotive, now *84 requires the employment of a fireman on diesel-electric locomotives. I shall assume, without so deciding, that it does, in view of plaintiffs’ claim that each of the sections of the Railroad Law under attack burdens them with the employment of firemen who perform no necessary functions. It may be noted in passing, however, that when section 54-a was enacted it was contemplated that railroads might be operated in this State by forms of power other than steam (see Public Service Commission Law [now Public Service Law], § 2, subd. 6; L. 1910, ch. 480). However, no matter what section 54-a requires with respect to firemen, the question which must be determined is whether it was unreasonable to require the employment of firemen (or helpers) on diesel-electric and electric locomotives in 1936 and 1937, and if not, whether that requirement is unreasonable under present conditions, or at least whether the question of reasonableness is fairly debatable so as to preclude its determination by the courts.
Sections 54-b and 54-e, as has been stated, require that fuel-electric engines run or operated on any railroad in this State be manned by a crew of not less than one engineer, and one fireman or helper, and that no locomotive, motor or self-propelled unit operated by any form of energy, except a multiple-unit car or cars, shall be operated on railroads of more than 50 miles in length in switching or transfer operations, without a crew which shall contain a fireman or helper. The words fireman or helper were used to designate the second man in the engine crew and by the requirement that a fireman or helper must be present in the cab of the locomotive, the Legislature appears to have recognized that to secure safety in railroad operations certain duties should be performed by someone qualified to perform them (cf. Bressler v. Chicago & N. W. Ry. Co., 152 Neb. 732). The statutes do not specify what those duties are but in the absence thereof the requirement could only have been intended to mean such duties as were generally associated with the position of fireman, or helper, as the second man in the engine crew was sometimes referred to on locomotives such as the diesel-electric, on which the work of firing the boiler was not required to be performed.
Since the early days of railroading the engine crew has customarily consisted of an engineer, responsible for the operation of the locomotive, and a fireman, who under the jurisdiction of the engineer has been responsible for the production of power. It was the duty of the fireman on the steam-powered locomotive to maintain the fire, and to maintain a proper water level in the boiler. When not so engaged, however, he assisted the engineer in the observance and calling of signals, and acted as a lookout *85 on the left side of the locomotive. He assisted the engineer in the repair of hot journals, and under his direction in some details of the operation and lubrication of the locomotive. He was required in case the engineer should become incapacitated to take over and bring the engine to a stop. Although his lookout and signal passing duties were necessarily limited on the hand-fired steam locomotive, they were more extensively performed in locomotives equipped with mechanical stokers, and on the oil-burning locomotives. With the advent of the diesel-electric locomotive, the fireman, or helper, continued to perform duties which were different but similar to those that were performed by the fireman on the coal or oil-burning locomotives. He did not, of course, tend fires or maintain the water level in the boiler. He did, however, perform comparable duties in connection with the operation of the new type of locomotive. Under present conditions the firemen, or helpers, on diesel-electric or electric locomotives have a variety of duties, some prescribed by rule, and some by custom and practice. The fireman (or helper) sits on the left side of the locomotive cab, and it is his duty to act as a lookout on the left side of the train. In some types of locomotives the engineer has a reasonably complete view of the track ahead, on both right and left. On others and in certain types of operation, his view to the left or to the side opposite to that in which he sits is obstructed either by the structure of the locomotive or, in pushing operations, by cars ahead of the locomotive. It is the duty of the fireman, as well as that of any other crew member who may be in the locomotive cab on road freight service to observe and call signals, to observe the condition of his own train, to be alert for objects on or approaching the tracks ahead of the train, and to receive and transmit to the engineer signals from passing trains, or towers or stations on the lefthand side of the train. It is also his duty to see that signals are obeyed and speed regulations are observed by the engineer, and to take appropriate action if they are not, and under certain circumstances to act as flagman to protect the head end of the train while it is stopped. The fireman is taught and required to learn about the mechanical operation of the locomotive, and the engine, as well as to acquaint himself with the electrical circuits and other features of the diesel-electric power plant. He is taught how to discover, and to some extent to correct, malfunctions in the operation of the locomotives, and customarily relieves the engineer at times and operates the locomotive under his supervision. No training is given the other members of the train crew with respect to the operation of the locomotive or the discovery or correction of malfunctions in its *86 operation. When conditions permit, the fireman, or helper, answers alarms from other units of the engine consist, and makes inspections to discover malfunctions for which there are no alarms. It is argued that insofar as the lookout and signal passing functions of the fireman are concerned, the fireman contributes little, if anything, to the safety of freight operations, since the engineer needs little, if any, assistance in this respect, and in any event the head end brakeman is present in the cab to perform those functions and actually does perform them. With respect to the making of inspections and correction of mechanical or electrical malfunctions, it is asserted and has been found by the commissions heretofore referred to, that only minor malfunctions can be corrected by firemen and that in any event correction of malfunctions takes little of the fireman’s time, and that the same corrections could be made by the engineer, even though he might have to stop the train to do so, or by maintenance employees, with little loss of time. The evidence also establishes that access to one locomotive from another is difficult and dangerous, when some types of locomotives are in use. With respect to the relief of the engineer, in road service, it is also asserted that in the event of an emergency created by the death or illness of the engineer, any member of the train crew riding in the cab can easily stop the train, and that in any event such occurrences are infrequent, and the possibility of their occurrence does not justify the retention of the fireman as a member of the engine crew. It is also established, however, that the engineer’s tour of duty often requires many hours of work, in snow, sleet or rain, and other adverse weather conditions, and the argument that temporary relief of the engineer by the fireman contributes to safety under such conditions is at least worthy of serious consideration.
In yard service the fireman’s most important function is that of a lookout, and in passing signals to the engineer when the ground crew must work on the fireman’s side. In many switching operations, particularly when the locomotive is pushing cars, the engineer’s view to the left is quite restricted, and he must depend on the fireman, or on signals transmitted by the ground crew, directly to him for information as to vehicles, other cars or engines, laborers or other persons on or in the vicinity of tracks, and clearances of other cars, engines or objects with relation to the movement of his locomotive, and as to objects on the tracks which might be a source of danger. It is claimed that the fireman is not necessary because the lookout function can be performed by the yard crew, and that signals can be passed directly to the engineer, at the expense only of a slight *87 loss of time, if the trainmen are required to shift their positions to the engineer’s side. During these operations the speed of the locomotive is slow and the engineer must be prepared to stop at all times. The argument is also advanced, however, that the engineer, no matter how slow the speed may be, will not stop for an obstruction which he cannot see and which he does not know about, and in any event, in yard operations, the fireman is often the only person in the cab who can relieve the engineer in case of fatigue, or an emergency involving physical inability to perform his work. The Presidential Railroad Commission recommended, and the Arbitration Board appointed pursuant to Public Law 88-108 directed, that locomotives should not be operated in yard service without a fireman unless equipped with a “ dead-man” control. At present, although such controls are installed in some yard engines, they are not installed in all.
The evidence establishes, and I find, that in road freight service, particularly in switching operations, the head brakeman on frequent occasions is not in the cab of the locomotive, and the fireman is the only crew member in position to take and pass signals and to act as lookout on the left-hand side. Moreover, in all types of service, he is the only employee in the cab who may be expected to be capable of relieving the engineer in case of fatigue or emergency.
The evidence does not establish, nor do I find that the lookout and signal-passing duties of the firemen in road freight service are unsubstantial or that they can be dispensed with without some sacrifice of safety.
The law does not require the head brakeman to ride in the cab of the lead locomotive. He rides there pursuant to railroad rules, and there is nothing in the law to prevent a change in the rule. The railroads make no complaint that it is unreasonable to require the presence of two men in the locomotive cab in road freight service. Nor do they complain that a fireman is required as part of the engine crew in passenger service, in which the head brakeman does not ride in the locomotive cab. It may be that the fireman can correct only minor malfunctions. Even so, such corrections may make some contribution to safety, and if it be conceded that in yard service the ground crew can discharge the lookout and signal passing duties of the fireman, the evidence does not establish that they do so to such extent that the fireman’s services are unnecessary. Although there is room for argument, and the question may be fairly debatable, I do not find that it is unreasonable to require, as the full crew statutes do, that a second man be present in the locomotive cab, or that the second man shall have, in addition to ability to act as lookout *88 and read and pass signals, the training and qualifications ordinarily possessed by firemen, which may make it possible for him to be of assistance to the eigineer in the operation of the locomotive. Even if it be assumed that in road freight service the head brakeman is in all respects as competent as the fireman to perform and does adequately perform the duties assigned to both which are necessary in the interest of safety, it may not be held that the statutory rule is unconstitutional because the railroad rule adequately protects against the same hazards. Such a holding would subordinate the lawmaking power of the Legislature to the rule-making power of the railroads (cf. Northern Pacific Ry. Co. v. Warner, 77 N. D. 721), and, as has been stated, if compliance with both the rule and the statute involves a burdensome duplication of services, the rule may be changed.
The question remains whether it is reasonable to require three brakemen in road service on a freight train of over 25 cars in length and two on a train of 25 or less, and to require two trainmen or helpers in yard and transfer service. It is the contention of plaintiffs that they have operated and do operate freight trains safely and efficiently, of much greater length than 25 cars, without a third brakeman and that the third brakeman who boards the train or leaves it at the New York State line performs no useful service, and contributes nothing to safety. It is also the contention of some of the plaintiffs that second brakemen in yard and transfer service, and in road freight service are unnecessary and contribute nothing to safety. Freight trains of more and less than 25 ears are handled safely, according to these plaintiffs, by a conductor and one brakeman, and switching and transfer operations are similarly handled with due regard to safety. Other plaintiffs, however, make no complaint at all as to the second brakeman and are apparently content to continue with a crew consist containing two brakemen on all assignments.
I do not find that the evidence sustains the contention that the third brakeman in road freight service performs no duties. He performs the duties assigned to him by the conductor, and these duties are no different than those performed by the other brakemen. All the brakemen perform lookout duties, particularly with respect to their own train, to discover evidence of hotboxes, trailing equipment, or other failures which may lead to derailments or other serious trouble. One brakeman customarily observes the track over which the train has passed, for evidence of trailing equipment, or defects in the track or roadbed, and has the duty of protecting the rear end of the train, when the *89 train is stopped under such conditions that rear-end protection is necessary. When an emergency stop is made, the brakemen examine both sides of the train, from front and rear, to determine the source of the trouble. When road switching is necessary, they handle switches and aid in setting out or picking up cars. At grade crossings they may be required to flag the crossings for the protection of the public or to aid in cutting and separating the train, if it is stopped so that it extends across a highway. Although the conductor is also available for these duties, he is required to do considerable paper work and to assume over-all control of the operation of his train. Brakemen are required to observe and inspect passing trains and to report any defective conditions which they may observe, as well as to take and pass signals from passing trains, stations and other locations along the railroad. They also pass signals from the ground, in the process of road switching, and thus help control the movement of the train in passing objects where clearances are close, or the way is obstructed. Under modern conditions a train of 25 cars is approximately a quarter of a mile in length, and trains of over a mile, or of two miles, in length are not uncommon. The third brakeman rides where he is directed to ride by the conductor, usually in a trailing unit of the engine consist, or in the caboose. In either position, with a train of a mile or more in length, he has a considerable responsibility with respect to his duty to keep even one side of the train under observation, in addition to that which he is required to discharge in watching passing trains, and in passing signals. In switching operations his signal passing responsibilities often involve relaying signals to the engineer as to conditions which the engineer cannot observe from the cab. Although the occasions may be infrequent, he may also be required to take the place of one of the other brakemen, who may be left behind to warn other train crews as to defective track conditions, or when his rear end flagging duties take him a considerable distance from the train, or he may be called upon to assume those duties himself. Even when his duties involve nothing more than the saving of time in getting a train under way after an unscheduled stop, the service performed may contribute to safety by helping to clear the track and thus prevent a rear-end collision which might otherwise occur, or at least a reasonable argument may be made to that effect. Although no specific reason appears or has been stated in the statutes why trains over 25 cars in length should require the services of a third brakeman and trains of 25 ears or less should not, it may also be argued reasonably that the duties of the train crew are frequently more *90 numerous and more exacting on a long train than on a short one, and that the trainman’s responsibility increases proportionately with the increase in the length of the train.
What has been said of the third brakeman applies with even greater force to the second brakeman in road freight and transfer service on trains of over 25 cars or of 25 cars or less. Indeed, no claim is made that the second brakeman is unnecessary in either road freight or yard service by the Baltimore and Ohio, the Lehigh Valley, the Long Island, or the New York, New Haven and Hartford railroads. The Boston and Maine and the New York, Chicago and St. Louis railroads make no complaint about the second brakeman on road freight service, but they and the remaining plaintiffs claim that some second brakemen in yard service are unnecessary. Prior to the enactment of the Federal arbitration statute (Public Law 88-108), existing rules and practices typically called for a crew in yard service consisting of a foreman and two helpers, the crew consist required by section 54-c of the Railroad Law. The evidence presented establishes that activities in yard switching operations and duties to be performed are so varied that it is difficult to conclude that safety of operations requires the assignment of a specific number of trainmen on all occasions. It is probable that the problem may be better solved in each case in accordance with local conditions. However, the evidence discloses such a wide variety of duties with respect to handling switches, flagging, observation and avoidance of close clearances, obstructions and persons on tracks, and passing of signals, which will contribute to safety, in addition to other duties which contribute to the efficiency of the switching operations, that it is obvious that a safety problem exists, which is the proper subject of legislative action.
Five of the plaintiffs complain that the second brakeman on certain trains, other than freight trains, of five cars or more are unnecessary. Insofar as these trains include those which actually carry passengers, the requirement does not appear to be unreasonable. These brakemen, as in the freight service, have duties involving flagging, lookout and signal passing, and in addition are required to assist passengers in boarding and alighting from trains, as well as to protect them from disorder. With respect to the trains which do not carry passengers, it is difficult to understand why two brakemen should be necessary on trains of five or more cars, and not necessary on trains of less than five cars. Neither is it easy to understand why it should be required that a light engine, without a car or cars, should have a crew of three, consisting of an engineer, a fire *91 man and a conductor or brakeman, or why baggagemen should be required in the interest of safety on baggage trains or passenger trains carrying baggage. However, only two of the plaintiffs claim that baggagemen are unnecessary, and no complaint is made that any member of the light engine crew is unnecessary except the fireman. It may be, although it is not clear, that the Legislature believed that the assignment of baggagemen was reasonably necessary for the protection of baggage and would leave the other train crew members free to perform their safety functions, and had in mind, with respect to the crew of light engines, the necessity for lookout duty and flagging, in the event of unscheduled stops.
It is true that technological progress in railroad operations has to a great extent lightened the load of the train crews, and has eliminated many of the dangers which existed when the full crew laws were enacted. The danger of collision has been reduced by improvements in signals and automatic and central traffic control, and the use of automatic train stop equipment. Electronic detector devices and improvements in rails and roadbeds, in car construction, and in lubricating devices, have materially lessened the danger of derailment which existed 30 years ago. Nevertheless, as has been stated, trains are longer and heavier, and are operated at greater speed, and in spite of the material advances and improvements in technology, collisions and derailments still occur. Improvement in radio equipment has materially lessened the danger that essential information may not be adequately conveyed to the engineer, from the rear end of freight trains, or from the ground crew in switching operations. Nevertheless, the evidence establishes that malfunctions do occur in radio equipment as well as in other safety devices. It may be that under perfect operating conditions, when nothing unusual or unexpected occurs, the danger of accident is slight. Statutes are not unreasonable, however, because they require that trains be manned for the possibility of adverse or emergency conditions which may be reasonably anticipated. The evidence does not establish that when the full crew laws were enacted they required the employment of trainmen whose services were not reasonably necessary to give protection against the dangers of railroad operations, and, as was said in Missouri Pacific R. R. Co. v. Norwood (13 F. Supp. 24, 36) in answer to an argument similar to that advanced here, the dangers have only been lessened, and that lessening is not of a proportion to show that the trainmen or helper requirements are clearly unreasonable and arbitrary.
*92 It must be conceded that the criticism leveled against the full crew laws is not without merit. They are mandatory and inflexible and make no distinction between differences which exist in the operation of different railroads, or in different types of operation on the same railroads. They may, as plaintiffs contend, exact needless and wasteful requirements in some cases, and it may be that some assignments may be as safely and efficiently handled with fewer employees than the laws require. But railroad operations are unquestionably a proper subject for reasonable regulation under the police power of the States (Chicago, Burlington & Quincy R. R. v. Iowa, 94 U. S. 155, 161), and it is for the Legislature, and not for the courts, to balance the advantages, and disadvantages, of the requirements of the statute, unless they are clearly unreasonable or not related to the legislative purpose.
Obviously greater flexibility in regulation could be attained by empowering a regulatory agency to control crew consist practices, as the Public Service 'Commission suggested. However, the Legislature did not see fit to adopt that suggestion, and apparently was of the opinion, on the basis of facts known to it, or which could reasonably be assumed to exist, that the hazards of railroad operation not only required legislative action in the interest of safety, but that they existed to such extent that uniform regulation was required to attain the degree of safety which the legislators considered essential (cf. Williamson v. Lee Optical Co., 348 U. S. 483). There is, of course, room for argument that the inflexible requirements of the statutes are arbitrary and unreasonable. They are no more so, however, than these of the Arkansas full crew statutes found to be constitutional by the Supreme 'Court of the United States, despite similar arguments against them (Chicago, Rock Is. & Pacific Ry. Co. v. Arkansas, 219 U. S. 453; St. Louis Iron Mountain Ry. v. Arkansas, 240 U. S. 518, supra) or the statute sustained by the same court in Williamson v. Lee Optical Co., supra). The reasons which prompted the choice of remedy are not recorded, but in the absence of proof to the contrary we may not assume that the legislative choice was capricious, or that with its informed acquaintance with the conditions to which the legislation was to be applied, it was not aware of facts which formed a reasonable basis for its action (Farrington v. Pinckney, 1 NY 2d 74, 88); neither may we set aside the legislative action because other and more efficient methods of solving the problem may exist, or merely because compliance with the statutes may be burdensome (cf. Munn v. Illinois, 94 U. S. 113; Ferguson v. Skrupa, 372 U. S. 726, supra; Standard Oil Co. v. Marysville, *93 279 U. S. 582, supra). The cost of compliance with the laws is, of course, an element properly to be taken into consideration in determining whether they are arbitrary and repugnant to the due process clause of the Fourteenth Amendment (Missouri Pacific R. R. Co. v. Norwood, 283 U. S. 249, 255, supra; Lehigh Val. R. R. Co. v. Commissioners, 278 U. S. 24, 34) but the question in each case must be determined in the light of all the facts, and with a just regard to the advantages to be derived by the public and the expense to be incurred by the carrier (Oregon R. R. & Navigation Co. v. Fairchild, 224 U. S. 510, 529). Although it has been stated, with respect to State safety statutes affecting railroads, that neither potential bankruptcy nor engagement in interstate commerce will excuse failure to comply with their provisions, and that if the burdens which they impose are so great that the road cannot be run at a profit, it can stop, whatever the misfortunes the stopping may produce (Erie R. R. Co. v. Picblic Utility Comrs., 254 U. S. 394, 410, 411), these pronouncements when read in context are not in conflict with the rule announced in Lehigh Val. R. R. Co. v. Commissioners (supra, p. 34) that danger to the public will not “ justify great expenditures, unreasonably burdening the railroad, when less expenditure can reasonably # * * avoid the danger.”
The evidence presented in this case does not establish that compliance with the laws has proportionately increased the operating expenses of the railroad over those which were necessary when the laws were enacted. Over the years, rates of pay have increased in the operation of railroads as they have in other industries. It does not appear, however, that it has been necessary to employ more men, either as firemen or trainmen. Firemen continued to be employed on diesel locomotives, as they were on the steam-powered engines, and for all that appears to the contrary train crews were not increased. According to the evidence, at least on the New York Central, revenue ton miles per freight train are at the highest in the history of that railroad since 1921, at least, and the road operates with the lowest number of employees in its history. However, locomotive crews do include firemen, and brakemen who leave the trains at the State lines, and the railroads are obviously operating trains with a considerable number of employees whose services they would dispense with if they could. Nevertheless, the employment of firemen was required by national agreement until 1964, although brakemen, or other trainmen assignments might have been materially reduced if the full crew laws were not in effect. On trial it was stipulated, subject to objections by defendants and intervenors-defendants as to relevance and materiality, that *94 if the necessary witnesses were called they would testify that in the absence of the full crew statutes the plaintiffs, insofar as they otherwise had the right to do so, would eliminate crew assignments on trains in New York State for which they pay at the present time per year for:

It is understandable that plaintiffs cannot produce more definite proof as to this element of their case, but the difficulty is that it is not possible to determine on the basis of the present proof what crew assignments plaintiffs would now be able to eliminate, in view of the determination by Arbitration Board No. 282, heretofore referred to, that jobs may be eliminated, with certain exceptions, only in accordance with the principle of natural attrition. The conclusion is reasonable that in time, although not at present, the cost of compliance with these statutes may involve the expenditure of the amount estimated. However, the danger sought to be avoided by the legislation is clear, and the remedy adopted by the Legislature is reasonably related to the danger, and to the legislative purpose to avoid it. Consequently, it may not be said that the legislative purpose can be reasonably accomplished by any lesser expenditure, or in any event that the cost is not within reasonable limits, at least at present. Whether the cost in the future will be so unreasonable as to justify a different determination may be better decided in the light of conditions which may exist at that time.
With respect to the first cause of action, I conclude that plaintiffs have not established that the statutes under attack deprived them of their property without due process of law when enacted, or that the dangers sought to be avoided when the statutes were enacted have lessened to such extent that the minimum crew requirements are now clearly unreasonable and arbitrary.
Neither do I find that these statutes contravene the equal protection clause of the Fourteenth Amendment, or of section 11 of article I of the Constitution of the State of New York. It is well established that the prohibition of the equal protection clause goes no further than the invidious discrimination (Wil *95 liamson v. Lee Optical Co. (348 U. S. 483, 489, supra). Neither our own Constitution nor the equal protection clause of the Fourteenth Amendment takes from our Legislature the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard. Neither is it required that every State regulatory statute apply to all in the same business or industry. Reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind (Morey v. Doud, 354 U. S. 457, 465). That the full crew laws single out the railroads from other competing forms of transportation may seem unfair, and even unwise, but there are obvious differences between railroads and other forms of transportation, both in relation to methods of operation and relations to the public, and statutes regulating railroad operations do not deny equal protection of the laws merely because they do not purport to regulate other forms of transportation (cf. New York Cent, & Hudson Riv. R. R. Co. v. Williams, 199 N. Y. 108, 123). Concededly, however, classifications must rest on some reasonable basis and it is difficult to understand why section 54-c should require a minimum crew in switching operations on railroads of more than 50 miles in length, and not on shorter lines, even though it is easier to justify the similar provision in section 54-a. Presumably the hazards of road operations were considered greater on long runs than on short ones, but it would seem that the dangers inherent in switching operations are equally great on short line roads as on roads of greater length. However, when such a classification is called into question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed (Morey v. Doud, 354 U. S. 457, 464, supra). It is, of course, quite possible, and we must therefore assume in the absence of proof to the contrary, that there were differences in the conditions under which switching operations were carried out on long and short lines in this State which reasonably justified separate treatment.
The Arkansas full crew statutes which contained similar classifications were also attacked on the ground that such classifications denied the plaintiff railroads equal protection of the laws. Commenting on the requirement that full crews be employed in Arkansas in road freight service on railroads of at least 50 miles in length, the Supreme Court said: “ And the statute being applicable alike to all belonging to the same class, there is no basis for the contention that there has been a denial of the equal protection of the laws.” (Chicago, Rock Is. & *96 Pacific Ry. Co. v. Arkansas, 219 U. S. 453, 466, supra.) With respect to the statute requiring minimum crews in switching operations, the court said: “ A more serious objection is that certain terminal companies, one at the City of Helena and one at Fort Smith, do switching for certain connecting trunk lines and yet, by reason of their length being less than one hundred miles, are not covered by the act. Indeed, it is said that one of them, that at Fort Smith, does switching over some of the same crossings that plaintiff in error does. The distinction seems arbitrary if we regard only its letter, but there may have been considerations which determined it, and the record does not show the contrary. We have recognized the impossibility of legislation being all-comprehensive and that there may be practical groupings of objects which will as a whole fairly present a class of itself, although there may be exceptions in which the evil aimed at is deemed not so flagrant.” (St. Louis Iron Mountain Ry. v. Arkansas, 240 U. S. 518, 521, supra; see, also, People v. New York, New Haven & Hartford R. R. Co., 142 N. Y. 646, affd. 165 U. S. 628.)
Plaintiffs ’ third contention, that the full crew laws are a direct interference with and burden on interstate and foreign commerce, in violation of article I (§ 8, cl. 3) of the United States Constitution, requires little discussion. Concededly, Congress has the power to regulate foreign and interstate commerce. But under our constitutional system there necessarily remains to the States, until Congress acts, a wide range for permissible exercise of power appropriate to their territoral jurisdiction, although interstate commerce may be affected (Kelly v. Washington, 302 U. S. 1). Undoubtedly the full crew laws affect interstate and foreign commerce. They do not regulate it, however, nor do they substantially impede its flow into or out of the State, and with respect to the contention that they constitute a direct interference with, and a burden on it, the Arkansas full crew cases, heretofore referred to, appear to be controlling, unless, by the enactment of United States Public Law 88-108 in 1963, Congress entered the field of railroad regulation to such extent as to preclude action by the States with respect to train crew consists.
Answering a similar attack on the 1907 Arkansas full crew law, the Supreme Court said: “ The statute here involved is not in any proper sense a regulation of interstate commerce * * *. Upon its face, it must be taken as not directed against interstate commerce, but as having been enacted in aid, not in obstruction of such commerce, and for the protection of those engaged *97 in such commerce. * * * Undoubtedly, Congress, in its discretion may take entire charge of the whole subject of the equipment of interstate cars, and establish such regulations as are necessary and proper for the protection of those engaged in interstate commerce. But it has not done so in respect to the number of employees to whom may be committed the actual management of interstate trains of any kind. It has not established any regulations on that subject, and until it does, the statutes of the State, not in their nature arbitrary, and which really relate to the rights and duties of all within the jurisdiction, must control. This principle has been firmly established, and is a most wholesome one under our systems of government, Federal and state.” (Chicago, Rock Is. & Pacific Ry. Co. v. Arkansas, 219 U. S. 453, 466, supra.)
This holding was reaffirmed in Missouri Pacific R. R. Co. v. Norwood (283 U. S. 249, 252, supra) and in Southern Pacific Co. v. Arizona (325 U. S. 761, 782) the Supreme Court again reiterated its former holdings, stating: 11 While the full train crew laws undoubtedly placed an added financial burden on the railroads in order to serve a local interest, they did not obstruct interstate transportation or seriously impede it. They had no effects outside the state beyond those of picking up and setting down the extra employees at the state boundaries; they involved no wasted use of facilities or serious impairment of transportation efficiency, which are among the factors of controlling weight here. In sustaining those laws the Court considered the restriction a minimal burden on the commerce comparable to the law requiring the licensing of engineers as a safeguard against those of reckless and intemperate habits, sustained in Smith v. Alabama, 124 U. S. 465, or those afflicted with color blindness, upheld in Nashville, C. & St. L. R. Co. v. Alabama, 128 U. S. 96, and other similar regulations. New York, N. H. & H. R. Co. v. New York, supra; Atlantic Coast Line R. Co. v. Georgia, supra; cf. County of Mobile v. Kimball, 102 U. S. 691.”
Insofar as the laws’ impact on foreign or interstate commerce is concerned, the full crew laws were not unconstitutional when enacted, and the evidence does not establish that when applied under present conditions they have any greater or different impact on commerce than they had at that time or, for the reason heretofore stated, that the cost of compliance constitutes an unnecessary or unreasonable burden thereon.
The question remains whether 'Congress by the enactment of Public Law 88-108 in 1963 (77 U. S. iStat. 132) entered the field of railroad regulation to such extent as to invalidate the State *98 full crew laws. Perhaps, with respect to the regulation of working conditions, not related to health or safety, the field had already been pre-empted by the provisions of the Railway Labor Act (U. S. Code, tit. 45, § 151 et seq.), leaving such regulation to bargaining agreements between employee and employer (see United Air Lines v. Industrial Welfare Comm., 211 Cal. App. 2d 729, and cases cited). Such does not appear to be the case, however, with respect to laws relating to minimum requirements of health or safety, even when applied to those employees whose collective bargaining agreements are imbued with the force of Federal law by virtue of the Railway Labor Act (cf. Missouri Pacific R. R. Co. v. Norwood, 283 U. S. 249, supra; United Air Lines v. Industrial Welfare Comm., 211 Cal. App. 2d 729, supra).
Protection of life, health, safety and property is a local problem and primarily the function of the States (Bradley v. Public Utilities Comm., 289 U. S. 92) and the right on the part of the States in a field not occupied by Congress to protect the life, health and safety of its people is in no way inconsistent with the purpose of the commerce clause to place in Congress supreme control over interstate commerce, since the paramount authority of Congress always enables it to intervene in its discretion (Minnesota Rate Cases, 230 U. S. 352; South Carolina State Highway Dept. v. Barnwell Bros., 303 U. S. 177).
‘ ‘ States are thus enabled to deal with local exigencies and to exert in the absence of conflict with federal legislation an essential protective power. And when Congress does exercise its paramount authority, it is obvious that Congress may determine how far its regulation shall go. There is no constitutional rule which compels Congress to occupy the whole field. Congress may circumscribe its regulation and occupy only a limited field. When it does so, state regulation outside that limited field and otherwise admissible is not forbidden or displaced. The principle is thoroughly established that the exercise by the State of its police power, which would be valid if not superseded by federal action, is superseded only where the repugnance or conflict is so ‘ direct and positive ’ that the two acts cannot ‘ be reconciled or consistently stand together.’ ” (Kelly v. Washington, 302 U. S. 1, 10, supra.)
Congress, in enacting legislation within its constitutional authority over interstate commerce, will not be deemed to have intended to strike down a State statute designed to protect the health and safety of the public, unless its purpose to do so is clearly manifested (Reid v. Colorado, 187 U. S. 137, 148) or unless the State law in terms or its practical administration *99 conflicts with the Act of 'Congress, or plainly and palpably infringes on its policy (Southern Pacific Co. v. Arizona, 325 U. S. 761, 766, supra).
In areas of the law not inherently requiring national uniformity, State statutes enacted under the police power and otherwise valid must be upheld, unless there is found such actual conflict between the two schemes of regulation that both cannot stand in the same area, or evidence of Congressional design to pre-empt the field (Head v. New Mexico Bd. of Examiners, 374 U. S. 424, 429, 430).
With respect to railroad full crew laws, the Supreme Court of the United States has said: ‘ ‘ In the absence of a clearly expressed purpose so to do, Congress will not be held to have intended to prevent the exertion of the police power of the States for the regulation of the number of men to be employed in such crews.” (Missouri Pacific R. R. Co. v. Norwood, 283 U. S. 249, 256, supra.)
It seems obvious that the regulation of train crew consist practices does not fall within an area of the law which inherently requires national conformity, although Congress undoubtedly has the power to enact a national regulatory statute. The first question which must be decided, therefore, with respect to the issue of Federal supremacy is whether the full crew laws conflict with the Act of Congress or the award made thereunder to such extent that they cannot be reconciled or consistently stand together. The full crew laws, the Federal statute and the award all touch the same subject. Such being the case, our primary function is to determine whether under the circumstances of this case the New York statutes stand as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress. The nature of the power exerted by Congress, the object sought to be attained and the obligations imposed by law are all important in considering the question of whether the Federal enactments preclude enforcement of the State laws (Hines v. Davidowitz, 312 U. S. 52, 66, 70).
Of course, if the language employed in the Federal law is so plain and unambiguous that the Congressional purpose and objectives are clear, there is no room for construction, and “ A holding of federal exclusion of state law is inescapable and requires no inquiry into congressional design where compliance with both federal and state regulations is a physical impossibility for one engaged in interstate commerce ” (Florida Avocado Growers v. Paul, 373 U. S. 132, 142, 143).
In the instant case it is obviously not impossible for the plaintiffs to comply with both the 'State full crew laws and the award *100 of the Board of Arbitrators. Compliance with the full crew laws completely satisfies the permissive provisions of the award. The fact that such compliance is possible, however, is not conclusive. If the Federal statute and award permit the operation of freight trains and locomotives in New York State with smaller crews than those required by the full crew laws, the State statutes, may not be enforced. A State may not prohibit that which Congress has authorized in a field over which Congress has authority (California v. Taylor, 353 U. S. 553; Franklin Nat. Bank v. New York, 347 U. S. 373).
It must be conceded that some of the language employed in the award appears to authorize, expressly, what the State statutes forbid. The language employed, however, must be read in context, in the light of the law which created the board and the board’s own explanation of its decision, as embodied in the opinion of its neutral members.
I do not believe that the language employed in the statute indicates a purpose to permit the Arbitration Board to determine that locomotives and trains may be manned, in States which had enacted full crew laws to eliminate the hazards of railway operations within their own borders, with smaller crews than those prescribed by such laws. Certainly, if there is such a purpose, it is not clearly expressed. On the contrary, both the language employed and the legislative history of the statute appear to evidence an intent not to interfere, in any way, with the operation of the State laws. Neither does the award of the arbitrators, when read in the light of its expressed purpose, evidence an intent to permit locomotives and trains to be manned in violation of State statutes. Unquestionably, as has been stated, the public law and the award made thereunder are part of the law of the land. We may not read into them, however, provisions which they do not contain, or purposes which were not intended. Like other laws, they must be interpreted so as to give effect to the Congressional intent so far as that intention may be effected within the bounds imposed by a fair reading of the legislation, and the award made thereunder.'
The public law is what it purports to be. As stated in its preamble, it is emergency legislation. It was designed to provide for the settlement of the existing labor dispute between “ certain carriers by railroad and certain of their employees ” and thus to avoid a threatened Nationwide strike. That dispute did not involve any question concerning the operation or enforcement of the .State full crew laws. No labor organization had threatened to strike, nor had any railroad threatened a lockout if the full crew laws should not be modified or repealed. Their *101 existence created no emergency. If the employees’ organizations had accepted the proposals contained in the notices served by the railroads, or if the railroads had accepted the proposals made by the organizations, there would have been no emergency, and no strike, and the full crew laws would not, in my opinion, have been affected in any way. The dispute which brought on the crisis which resulted in the emergency legislation involved only proposals to eliminate old rules, which existed by agreement or by reason of practices established by custom, and to establish new rules relating to the manning of locomotives and trains in road freight and yard and transfer services. It was this dispute, and nothing more, which was submitted to the Arbitration Board for determination. The parties to the dispute were free to decide it by agreement, if they could do so. If not, the arbitrators were to make a decision only as to the disposition of those portions of the carriers’ notices identified as “ Use of Firemen (Helpers) on Other Than Steam Power ” and “ Consist of Road and Yard Crews ” and that portion of the organizations’ notices identified as “ Minimum Safe Crew Consist ”, and implementing proposals pertaining thereto. The arbitrators were required to incorporate in their decision any matters on which they found the parties in agreement, and their award was to be ‘ ‘ binding on both the carrier and organization parties to the dispute ”, and constitute a complete and final disposition of the “ issues covered by the decision of the board of arbitration.” Both from the language employed and the available evidence of Congressional intent, the purpose of the public law seems clear. Congress was not concerned with the elimination of impediments to the flow of commerce across State lines, the removal of conditions that threatened the health or safety of workers, or the regulation of working conditions in the interest of railroad employees. The parties to the dispute were free to settle it by their own agreement if they could, and the resulting conditions could be as good, or as bad, insofar as safety and working conditions were concerned as the parties should choose to make them. What Congress was concerned with was the settlement of a dispute, in the interest of the national welfare, which the parties had been unable to settle by negotiation and agreement, and it seems clear that Congress did not intend to enter the crew consist field to any greater extent than was necessary to accomplish that purpose. The objectives were to be achieved, as stated in the preamble to the joint resolution, in a manner which “ preserves and prefers solutions reached through collective bargaining ”. Presumably, for that purpose, and to encourage further bargaining to bring about a permanent solu *102 tion of the problem, if possible, by agreement, the public law further provided that the relief to be obtained through abritration should be effective for a limited time. The award was to continue in force for a period not to exceed two years, unless the parties should otherwise agree.
That Congress did not contemplate that the full crew laws should be affected seems evident from the provisions of the statute. The fact that the dispute was to be settled by agreement, if possible, does not appear to be consistent with a purpose to supersede the State laws. It does not seem likely that Congress intended that laws enacted under the constitutionally protected police powers of the States might be set aside by agreement between the railroads and their employees. There is, of course, ample authority which establishes that collective bargaining agreements made pursuant to Federal law bear “ the imprimatur of the federal law ’ ’ upon them, and cannot be vitiated or made illegal by State laws. (See Railway Employees’ Dept. v. Hanson, 351 U. S. 225, 232; California v. Taylor, 353 U. S. 553, supra; Teamsters Union v. Oliver, 358 U. S. 283.)
No case has been cited, or discovered, however, which applies that principle against State laws relating to minimum requirements of health or safety, nor do I believe that it may properly be so applied, in the absence of a clearly stated Congressional purpose to effect such a result. Indeed, in the Oliver case (358 U. S. 283, 297, supra) in sustaining a collective bargaining agreement prescribing a wage scale for truck drivers, as against a State statute, the court said: “ We have not here a case of a collective bargaining agreement in conflict with a local health or safety regulation; the conflict here is between the federally sanctioned agreement and state policy which seeks specifically to adjust relationships in the world of commerce.” (See, also, Missouri Pacific R. R. Co. v. Norwood, 283 U. S. 249, supra.)
Neither does the fact that the award will provide only interim relief, unless the parties shall agree that it shall remain in force for more than two years, appear to be consistent with an intent to displace the State laws. That provision of the law does not preclude a determination of Federal pre-emption or supremacy, but it seems unlikely that Congress intended to give relief from the State statutes for such a limited period, during which the railroads could obtain little or no relief even if the award should be favorable to them and to subject them to the same restrictions thereafter. As I read the statute, and the award, that is the result that must follow, if it is held that the State laws are superseded. I am unable to agree that it was intended that the award of the arbitrators might have the effect of permanently *103 wiping ont the State laws, or precluding State action after the effective life of the award. Moreover, if Congress intended to have the arbitrators decide matters which were not in issue and to provide for a permanent method of settling future disputes, it seems unlikely that Congress would not have entered the railroad crew consist field completely. "Whatever the effect of the public law and the arbitration award may be, they cannot affect the full crew laws insofar as they provide for the employment of firemen on diesel-electric locomotives in the passenger service. No such question was included in the dispute or submitted for arbitration. Insofar as discussions in Congress and committee reports indicate Congressional intent, the evidence is not conclusive, but it does not indicate any purpose other than to solve the pending dispute, or any intent to supersede State laws.
In recommending the passage of the Joint Resolution, the Committee on Commerce, in the Senate, referred to the resolution as one designed to resolve the current dispute, and stated that it was not, and could not conceivably be considered as a precedent for any other labor-management dispute. It was, the committee stated, “ what it purports to be — a one shot solution through legislative means to a situation which imperilled, beyond question the economy and security of the entire nation.” In the House of Representatives, during the discussion of the proposed resolution, there appeared to be considerable doubt as to the effect its adoption would have on the State full crew statutes, but in reporting thereon and recommending its passage the Committee on Interstate and Foreign Commerce gave assurance that1 ‘ The committee does not intend that any award made under this section may supersede or modify any state law relating to the manning of trains.” The section referred to was section 3, which relates to the determination to be made by the arbitrators.
The award, like the public law, is of limited application. It stands, as it was intended to, as a binding determination of the dispute which existed, between the “ carrier and organization parties to the dispute.” In it the board makes a “ complete and final disposition of the issues submitted” which involved, as has been stated, only proposals contained in the notices served by the carriers and the organizations, which concerned rules established by agreement or practice, and did not indicate any purpose to affect State laws providing for the manning of locomotives or trains. It does not purport to nor does it dispose of any issues, other than those submitted.
Although the award of the board contains language which appears to permit the railroads to dispense with the use of *104 firemen in road freight and yard and transfer services, such as the provision that after 37 days following the effective date of the award the carrier shall not be required to use firemen (helpers) except as provided in the award, it is apparent that the board was dealing with the requirements of rules and practices established by agreement and custom, and not with the requirements of the full crew laws. That this was the intent of the award is made clear in the explanatory opinion of the neutral members, in which they say: “ On its face this procedure would seem to permit the individual carriers immediately to stop assigning firemen on ninety per cent of the freight engine crews and yard engine crews which they listed initially. That it will not have such an effect is due to three reasons. First, * * *. Second, a number of States, by law or administrative regulation, require the use of firemen in road freight or yard service. * *
The crew consist issue (other than engine service) was referred by the arbitrators to local properties for negotiation. If the parties to the disputes could agree, that would be the end of their dispute. As previously indicated, any such agreement could hardly have been intended to supersede State full crew laws. If negotiation should not prove effective the disputes, limited to the application of guidelines enumerated in the award, insofar as they might relate to the issues, were referred to special boards of adjustment for determination. No change was to be made in the scope or application of rules in effect, except by agreement, or pursuant to the procedure provided by the award.
The policy of the special boards with respect to possible conflict with full crew laws has not been uniform. Some, however, have made determinations which appear to authorize the carriers concerned to operate freight trains with crews smaller than those permitted under the full crew laws, although the boards have not attempted to resolve the question of conflict between those statutes and their determinations. Again the issues submitted to them involved only rules, agreements and practices. The Arbitration Board, in providing for special boards of adjustment, did not limit their activities to the determination of disputes in States which had no full crew laws. They could hardly have intended, however, to give to those boards powers which they did not have themselves. With respect to their own jurisdictional limitations, they had stated: “ Both of the issues before us concern manning and the effect on manning of technological progress and change. In view of the present national concern with such questions — with problems of automation and *105 unemployment — the limitations under which we must deal with these issues should immediately he made clear. We are an arbitration board, established to settle two particular points of controversy in a specific labor dispute. Though our authority comes from Congress, the issues we must decide were framed by the parties, and the scope of our action cannot exceed the scope of the actions which the parties themselves might have taken with respect to these issues had they been able to reach agreement. There are many questions of general social policy, community action, or legislation which bear on the problems before us, but they are not within our purview.”
I do not find that the State laws enacted to regulate railroad operations in the interest of safety stand as an obstacle to the accomplishment of the full purpose and objectives of Congress to settle the pending labor dispute, and thus avert a Nationwide strike, and to prevent strikes or lockouts over any dispute involving the issues arbitrated for at least two years. Neither do I find any conflict between the State laws and the Federal statute and the award, interpreted in accordance with the Congressional purpose, which requires the conclusion that the State laws have been superseded; nor does it appear that there is any policy expressed in the Federal act on which the State laws impinge. Such being the case, it follows that the State laws have not been superseded ‘ ‘ ‘ unless that was the clear and manifest purpose of Congress ’ ” (Florida Avocado Growers v. Paul, 373 U. S. 132, 146, supra; see, also, Missouri Pacific R. R. Co. v. Norwood, 283 U. S. 249, 256, supra; Reid v. Colorado, 187 U. S. 137, 148, supra).
I find no such purpose in the Federal act, nor in the award or the determinations of the special boards. It must be conceded that the question is not free from doubt, in view of the determination recently made in Chicago, Rock Is. & Pacific R. R. Co. v. Hardin (239 F. Supp. 1) by the Federal District Court in the Western District of Arkansas, in which a three-Judge court came to the conclusion, although not unanimously, that the Arkansas Full Crew Laws heretofore referred to are in substantial conflict with Public Law 88-108. This court must, and does, give due and great respect to the construction by a Federal court of a Federal statute, but we are not strictly bound in such matters by any but the United States Supreme Court decisions (People ex rel. Ray v. Martin, 294 N. Y. 61, 73, affd. 326 U. S. 496). In the instant case, for the reasons hereinbefore stated that those stated in the dissenting opinion in the Federal court, I am constrained to disagree respectfully with the conclusions expressed by the majority members of *106 that court. In view of the determination made, it is unnecessary to discuss or pass upon the defenses interposed or the motions made to dismiss the plaintiffs’ fourth cause of action,
'The defendants and the intervenors-defendants are entitled to judgment dismissing the complaint, and judgment is directed to be entered accordingly, with one bill of costs to the defendant Attorney-General and the two defendant-intervenors.
Requests to find submitted by the defendant Attorney-General are denied except insofar as the facts requested to be found have been hereinbefore stated.