IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 26, 2011 Session

## STATE OF TENNESSEE v. MAURICE JOHNSON

**Appeal from the Criminal Court for Bradley County**
**No. M-08-456      Amy Reedy, Judge**

_____

**No. E2010-01142-CCA-R3-CD - Filed August 16, 2011**

_____

A Bradley County jury convicted the Defendant, Maurice Johnson, of one count of especially aggravated robbery and three counts of first degree murder in the perpetration of an especially aggravated robbery. He was sentenced to life without the possibility of parole for each of the felony murder convictions and to twenty-five years for the especially aggravated robbery conviction. On appeal, the Defendant argues that the evidence was insufficient to sustain his convictions, that the district attorney engaged in repeated instances of misconduct substantially prejudicing the jury against him, and that the lead detective's wrongdoing warrants a new trial. Following our review, we affirm the Defendant's convictions and sentences for first degree murder during the perpetration of or attempt to perpetrate an especially aggravated robbery. The Defendant's conviction for especially aggravated robbery is reversed and dismissed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in Part; Reversed in Part**

DAVID H. WELLES, SP. J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

Steven B. Ward, Madisonville, Tennessee, for the appellant, Maurice Johnson.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; R. Steven Bebb, District Attorney General; and Richard Fisher, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### Factual Background

This case arises from the February 14, 1999 shooting deaths of Orienthal James ("OJ") Blair, Cayci Higgins, and Dawn Rogers ("the victims") in a townhouse in Cleveland. On October 8, 2008, a Bradley County grand jury indicted the Defendant and two co-defendants, Michael Younger and Twanna "Tart" Blair, for conspiracy to commit especially aggravated robbery, especially aggravated robbery, and three counts of first degree murder in the perpetration of an especially aggravated robbery. The court severed their trials, and the Defendant proceeded to trial in August 2009.

On the morning of February 14, 1999, Twanna Blair placed a call to Bradley County 911, informing them that she had been shot and that three other people had been killed. Officers responded to the scene, a townhouse in Cleveland, and discovered three victims lying on the living room floor. Emergency personnel rendered aid to Twanna Blair, who was found in the upstairs of the townhouse. The three victims were all deceased as a result of gunshot wounds to the head and/or neck.

Eric Hampton was a detective with the Cleveland Police Department and was the lead investigator into the triple homicides for some time until he relocated to Alabama several years later. Upon arriving at the scene, Det. Hampton observed that the kitchen door had been forcibly opened and that there were items on the kitchen floor, including a knife, a cordless phone, and black wire "flex" ties. He further described the condition of the townhouse as follows: "There did not appear to be anything disarrayed or ransacked, . . . and upstairs was pretty much, if I can remember correctly, several bedrooms and nothing gone through or looked to be ransacked as well."

Raymond DePriest, formerly with the Tennessee Bureau of Investigation ("TBI") and employed with the Nashville Police Department as the Forensic Quality Assurance Manager at the time of trial, testified that, at the end of processing a crime scene, the TBI "always" conducted a search for contraband. Agents look "through every drawer, every cabinet in the house, . . . go through the washer and dryer just looking for any evidence that may be present[.]" After searching the Cleveland townhouse, agents did not find any evidence of controlled substances being present in the residence.

TBI Special Agent Luke Mahonen, a detective with the Cleveland Police Department at the time of the murders, testified that, on February 14, 1999, he responded to the triple homicide call and shot the initial crime scene video. Agent Mahonen described what he would typically look for at a crime scene: "One would have looked for items of value missing, items of value being present, ways that entry could have been made, whether the

doors were locked or unlocked, signs of struggle, wallets, purses, things of that nature, currency, jewelry, things of value." When asked if he recalled finding any money at the scene, Agent Mahonen replied, "I don't recall, no."

The TBI sent a mobile crime scene unit to the townhouse to collect any possible forensic evidence. Agents recovered numerous items from the residence: clothing found at the top of the stairs belonging to Twanna Blair, wire ties, a cordless phone, a kitchen knife, a beer bottle near the back door, a "latch plate" from the back door, a fired .22 caliber bullet, fired and unfired .22 caliber cartridge cases, and a 9mm caliber bullet. DNA testing on blood samples recovered from inside the house revealed that the three victims or Twanna Blair were the sources of the samples. Only one unidentified sample was found inside the house, DNA present on a stamp, and it was never matched to anyone.

As result of the ensuing investigation, officers learned of an altercation between the Defendant and OJ Blair just two days prior to the murder. Tamara Rhea testified that, on the evening of February 12, 1999, she threw a party at her residence in Sweetwater and that about 100 people were in attendance.

Reginald Constant, OJ's cousin, testified that he was in custody being held as a material witness and that he had no criminal charges. Mr. Constant stated that he was at the February 12 party in Sweetwater, where he saw OJ Blair and the Defendant involved in an altercation. Mr. Constant and several others "broke up" the fight. While standing in the yard, the group heard gunshots. According to Mr. Constant, the Defendant then pulled out his gun and pointed it toward the porch. Mr. Constant said to the Defendant, "No, man it ain't even worth it," to which the Defendant replied, "You are going to let them shoot at me and I can't shoot back." Mr. Constant responded, "Man, that's my cousin." The Defendant then got in his vehicle and left. Mr. Constant stated that he was never afraid of the Defendant because he had known the Defendant for nineteen years and did not think he would shoot him. After the Defendant left, Mr. Constant also left the party before the police arrived.

Charles Brewster, Jr., was also in custody, being detained for the purpose of testifying at the Defendant's trial. Mr. Brewster was likewise in attendance at the February 12 party, where he witnessed two females get into a physical altercation. Mr. Brewster testified that he saw the Defendant and OJ Blair get into a verbal argument, overhearing the two men doing a "bunch of cussing[.]" When he again saw the Defendant on Saturday afternoon following the party, the Defendant said to him "[t]hat he had handled the situation. He retaliated and handled the situation."

Desmond Deane Benton also testified about his recollection of the February 12 party. He recalled that the Defendant and OJ Blair were "in each other's face. They was [sic] arguing and then all of the sudden they grabbed each other and they rolled out the front door off the porch onto the concrete, the driveway . . . . They started fighting and then shots broke out." According to Mr. Benton, when the shots were fired, everybody ran. Mr. Benton opined that OJ Blair was winning the fight.

Mr. Benton left the party and went to his girlfriend's house. Sometime later that evening, he returned to Tamara Rhea's apartment and saw Michael Younger at the trunk of his car, loading bullets into the clip of a black handgun. Mr. Benton stated that he had never seen the Defendant with a gun.

After shots were fired at the party, officers were called to the scene, which, according to Officer Kenny Wilkins with the Sweetwater Police Department, was known for its drug activity. As Officer Wilkins was traveling to the scene, he encountered Kenny Rogers, who had been shot at the party. Officer Wilkins stayed with Mr. Rogers until emergency personnel arrived to assist him. Despite a lengthy investigation, no one was ever charged with Mr. Rogers' shooting.

While Officer Wilkins waited with Mr. Rogers, other officers continued to the scene "where the party had taken place." Once at the party, the officers arrested the Defendant and took him to the local jail for questioning.

On February 14, 1999, around 2:00 a.m., Stacy Ann Clabough left The Party Zone, a club in Chattanooga, after Twanna Blair, OJ Blair, and Dawn Rogers failed to meet her there. When she returned to Cleveland, she went by the victims' townhouse to see why they had failed to attend. She knocked on the front door, and Twanna Blair answered. Twanna Blair told her that everyone was asleep, so Ms. Clabough returned to her car and left. As she was leaving the complex, she heard "a noise or something" that "caught [her] attention[.]" She turned to see someone sitting inside a dark, maroon vehicle. While she did not know the Defendant at that time, she was able to later identify him as the man inside the car; she claimed she was able to remember the Defendant's face due to the "shock." At the time of trial, Ms. Calbough was incarcerated for violating her probation on a prescription fraud conviction. Ms. Clabough also admitted that she had given several inconsistent statements to the authorities, that she had two forgery convictions, and that she had a tattoo commemorating OJ Blair's birth date.

Amy Lonas and the Defendant were in "a friend with benefits relationship" in February 1999. Ms. Lonas, then eighteen years old, stated that, on the evening of the 12th, she was present at the party with the Defendant and Michael Younger. She testified that she

saw the Defendant with a gun that evening and, according to Ms. Lonas, the Defendant "always had a gun." When OJ Blair and Twanna Blair arrived at the party, the Defendant said to Ms. Lonas, "They could die right there." Ms. Lonas and others told the Defendant, "No, don't do nothing like that." Ms. Lonas, who was underage and drinking and doing "a lot" of drugs, went back inside the house. After she heard gunshots, she left the party to avoid the police and returned to her apartment that she shared with Tiffany Gray.

At approximately 2:00 a.m. on February 13, the Defendant, Michael Younger, and Jason McGaughey came to Ms. Lonas' apartment. All of the men were intoxicated, and Younger hit the front door so hard it fell off the hinges. Ms. Lonas stated that her apartment complex was "run down" and that the door was not in good condition at the time. Ms. Lonas became upset because she did not want to have to tell her roommate about the door. Mr. McGaughey stayed to fix the door.

According to Ms.Lonas, the Defendant was agitated while he was at her apartment, and the men stayed approximately one and half to two hours. While there that morning, Ms. Lonas and the Defendant engaged in conversation. When discussing where the Defendant was headed once leaving her apartment, he said that "he was going to get his money back." Ms. Lonas then asked the Defendant "how much dope did you front him." The Defendant replied that "it was none of [her] business." The men left the apartment on foot. The following day, February 14, Ms. Lonas learned of the triple homicide from the television news.

Around 7:00 or 8:00 a.m on February 15, Ms. Lonas was taking out her trash, when she saw the Defendant. Although the Defendant was hostile, they again engaged in conversation. Ms. Lonas was upset with the Defendant because he had been having sex with another woman. When talking about where he had been, the Defendant said that "he had took care of it, . . . that he went to go get his money back, . . . he had done something real bad, . . . he was going to have to go away for a little while." The Defendant described his arrival at the townhouse to Ms. Lonas: "Twanna knew he was coming, they knocked on the door like the police to get in the door, . . . that it was only OJ in that house." According to the Defendant, OJ pulled a gun on him first so he had to shoot in "self-defense." The Defendant told Ms. Lonas that OJ was alive when he left the apartment and that, afterwards, he threw his gun in the Loudon County rock quarry. The Defendant warned Ms. Lonas that she should "never tell anybody anything" about what he had told her or he would kill her. The two got into "an irate argument" and decided to no longer be friends. Ms. Lonas agreed to never tell anyone about what the Defendant had told her.

Ms. Lonas admitted that she had criminal convictions for criminal impersonation in 1998 and shoplifting in 1999. According to Ms. Lonas, she had since "changed [her] whole

life" beginning in 2006. Ms. Lonas stated that she was now in college, studying medical assistance and medical billing, and had been a Certified Nurse's Assistant for the past three years. The police "found" her in 2006, and she then told the truth about what she knew about the murders. However, on cross-examination, Ms. Lonas acknowledged additional convictions for passing a worthless check and leaving the scene of an accident in 2006 and a simple possession charge in 2008.

Ranessa Macon testified that the Defendant visited her on Sunday morning February 14. He woke her up, asked her to sit on the couch, and told her he had killed someone. After hearing the news, the Defendant and Ms. Macon just stood in the middle of the room and hugged each other. She did not ask any further questions of the Defendant about what he had done. She admitted that, back in 1999, she was "using drugs pretty heavily[.]"

Tamara Rhea spoke with the Defendant a few days after the shootings, and the Defendant was apologetic about fighting at Ms. Rhea's party. Ms. Rhea asked the Defendant about the shootings, inquiring, "Did you have anything to do with that?" The Defendant jokingly said, "You never know."

Approximately a week or two prior to the party in Sweetwater, the Defendant told Analesha Harper that he had been beaten and robbed, but he did not know the perpetrator. The Defendant again visited Ms. Harper sometime after the February 12 party. He told her that an altercation happened at the party, that OJ Blair "was there," and that he was drunk at the time. According to Ms. Harper, the Defendant did not know who robbed him a few weeks prior to the party in 1999.

The Defendant again visited Ms. Harper in early 2006 and, according to Ms. Harper, the Defendant was upset because the television news had linked him to the murders. When Ms. Harper was asked if the Defendant ever told her at a later date "who he thought had something to do with" the robbery that happened just a week or two prior to the party, she replied, "When I asked him about the murders he was like the guy OJ remember, that was the guy that I had the fight with[.]" Ms. Harper asked the Defendant if he had anything to do with the murders, and he told her "no." Ms. Harper stated on cross-examination that she did not believe the Defendant ever knew who robbed him in 1999.

Vanessa Latham testified that, in February 1999, she was having a relationship with the Defendant, that they "messed around for a long time." Ms. Latham was in attendance at the party at Tamara Rhea's house. Ms. Latham caught the end of the fight between OJ Blair and the Defendant. To Ms. Latham, it looked like OJ Blair was "whipping" the Defendant. When she heard gunshots, she went to a neighbor's house.

After the murders, Ms. Latham talked with the Defendant in "Jake's parking lot"; they were "just chilling[.]" The Defendant asked Ms. Latham if she knew "that guy from Cleveland," to which she responded affirmatively, and the Defendant then said "we did that." Ms. Latham became upset because she had heard that one of the girls was pregnant. After she got upset, the Defendant said that "the fucking bitch shouldn't have had her ass there[.]" He then threatened to kill Ms. Latham if she ever told anyone about what he had told her. Ms. Latham stated that she did not believe the Defendant about the killings, that she did not know him to be bad person, and that she did not know "if he was joking around or not."

Several years later, Ms. Latham was contacted by the police. She claimed that the authorities were threatening to put her in jail and take her kids away if she did not cooperate, so she agreed to make a recorded phone call to the Defendant. Detective Duff Brumley of the Cleveland Police Department, who had taken over the investigation of the triple homicides after Det. Hampton's departure, was present when Ms. Latham placed the call to the Defendant. According to Det. Brumley, in the first phone call, the Defendant was "very reluctant to speak, was evasive, and asked Ms. Latham to go to a pay phone and call him or to a secure phone because he was afraid that his phone had been wire tapped." They then went to a pay phone, and Ms. Latham again phoned the Defendant. A recording of this call was played for the jury. During the phone call, the Defendant stated, "Now, Vanessa, listening [sic] to what I'm saying. Regardless of what me and you talked about nobody is going to know but me and you. Do you understand that?"

Stacy Marvin King testified that he had known the Defendant since they were teenagers. Mr. King was incarcerated at the time of trial and had been since March 2006. Mr. King testified that, in February 2006, he was on his way home from work, when he stopped at an Applebee's restaurant in Athens to eat. There he saw the Defendant, and the two men spoke about the triple homicides in Cleveland in February 1999. According to Mr. King, the Defendant was "agitated with regard to the talk on the streets." The Defendant said to Mr. King that "he wanted to resolve a problem he had, which was an individual still being alive and talking about events surrounding the murder." That individual was Twanna Blair.

While talking at Applebee's, the Defendant described the murders to Mr. King. The Defendant told him that, upon entry into the residence, he fired a shot at OJ Blair, killing him. The Defendant continued, "[W]e heard a noise upstairs, we got the individuals upstairs," and "they were shot with the intent of not leaving anyone alive[.]" According to Mr. King, the Defendant stated that his "negative situation . . . was only going to get worse" if he "didn't take out Ms. Blair[.]"

Mr. King acknowledged that he had been incarcerated many times; his current incarceration due to a federal firearms charge. He had multiple convictions for selling

cocaine and firearm possession and had violated his probation several times. Mr. King confirmed that the federal prosecutor had filed a "5K1" motion on his behalf, stating that Mr. King had provided "substantial cooperation." Upon this motion, a federal judge can reduce a defendant's sentence.

Mark Blair testified that he was locked up in the Monroe County Jail in February 1999. He testified that he spoke with the Defendant by telephone during that time, and the Defendant told him "that he had killed some people." On another occasion, he and the Defendant were walking around the track at the jail and talking, and the Defendant informed him that, when he got out of jail, he was going "put down a demo[.]" Mark Blair replied, "When you get out, . . . them youngsters ain't going to let you come out there and regulate or nothing." The Defendant then said, "I ain't worried about what them youngsters think, . . . if they get in the way I will do them just like me and Money did down in Cleveland." According to Mark Blair, Michael Younger was also known as "Money." The Defendant extrapolated to Mark Blair that he "handled the matter in Cleveland" after getting into a fight with OJ Blair at a party in Sweetwater. Mark Blair acknowledged that he had significant criminal history, including convictions for firearm possession, selling cocaine, aggravated assault, and evading arrest. He stated that he contacted the authorities with this information and confirmed that he did hope to receive some favorable treatment based on his cooperation.

In 2001, Agent Mahonen began working with the TBI. Agent Mahonen obtained a wiretapping order for the Defendant's cellular phone, and he had recorded over 300 of the Defendant's telephone calls. Agent Mahonen selected one phone call in particular to play for the jury; it was an incoming call, placed from Jewelry Television, Incorporated, made on February 14, 2006, at 10:47 a.m. Agent Mahonen believed that the Defendant was convicted of federal drug charges based upon information obtained during the wiretap of the Defendant's phone. Agent Mahonen also agreed that, on more than one occasion, the Defendant gave blood samples, hair samples, and fingerprints to the authorities.

In the years after the murders, TBI Special Agent Terry Arney, an expert in firearms identification, had been unable to match the cartridge cases or bullets from the scene to any particular weapon. Testing continued as late as 2007.

Following testimony from twenty-five witnesses, the State concluded its proof. The Defendant then made a motion for judgment of acquittal on all counts. The court dismissed the conspiracy charge, but the other counts were to be submitted to the jury. The Defendant then submitted proof in his defense.

Jason Juan McGaughey testified on behalf of the Defendant. He confirmed that he had drug convictions and a criminal history spanning approximately eighteen years. Mr.

McGaughey testified that he did not attend the party in Sweetwater. He did recall a visit to Ms. Lonas' apartment when he "messed her door up and she was tripping about her friend was going to put her out because the door was messed up." McGaughey testified that he was accompanied by Michael Younger, but the Defendant was not with him on that occasion. Mr. McGaughey fixed the door, and they left.

The Defendant testified and gave his version of the events. He admitted that, at the time of the murders, he sold drugs and had sexual relationships with a lot of women. The Defendant denied any involvement in the murders.

According to the Defendant, he supplied the alcohol for Tamara Rhea's party on the evening of February 12, 1999. He did not take his gun to the party, and he did not know OJ Blair prior to the party. He had heard that some "people from Cleveland had arrived at this party[.]" The Defendant claimed he was watching two women fight when someone punched him in the back of the head. He turned to see three or four people hitting him and, as he was attempting to ward of the blows, the fight moved into the yard. One person "just kept coming" at him. Someone then fired a gun, and his attacker ran into the house. He did not recognize any of the men who attacked him.

The Defendant was arrested after officers arrived at the scene of the party, and he was transported to the police station. Officers tested his hands for gunshot residue but did not find any, and the Defendant was never charged with any offense connected to the party. After being released from the police station, the Defendant walked to the hospital to see who had been shot. A lot of people from the party had gathered at the hospital, and he learned Kerry Rogers was the individual who had been shot. The Defendant and others waited until Mr. Rogers was released from the hospital. The Defendant then returned to the party, which had moved "two doors down from where the party" had originally begun. He drank and talked with people for two to three hours following his return.

The Defendant testified that, after the killings, he gave two statements to the police. When the police questioned him a third time, he refused to cooperate. He confirmed that, several years later, he was in federal prison with Mark Blair and that they talked "all the time." The Defendant denied ever making any incriminating statements to Mark Blair. After his release from federal custody, he did give a third statement to police. He also gave his fingerprints and DNA sample to authorities.

Following the conclusion of the proof, the jury found the Defendant guilty of the remaining four charges—especially aggravated robbery and three counts of first degree murder during the perpetration of an especially aggravated robbery. The Defendant was sentenced to life without the possibility of parole for each of the murder convictions. For the

especially aggravated robbery conviction, the trial court imposed a sentence of twenty-five years at 100% to run concurrently with the life sentences. The case is now properly before this Court.

**Analysis**

**I. Sufficiency of the Evidence**

First, the Defendant claims that the evidence was insufficient to sustain his convictions. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

A defendant may be convicted on the basis of direct or circumstantial evidence or a combination of both. State v. Winters, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003); see also State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In fact, circumstantial evidence alone may be sufficient to support a conviction. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011); State v. Tharpe, 726 S.W.2d 896, 899-900 (Tenn. 1987). Recently, our supreme court adopted the position of the United States Supreme Court "that direct and circumstantial evidence should be treated the same when weighing the sufficiency

of such evidence." Dorantes, 331 S.W.3d at 379-81. In Dorantes, the supreme court specifically rejected the holding in State v. Crawford, 470 S.W.2d 610 (Tenn. 1971), requiring that in a wholly circumstantial evidence case the State "prove facts and circumstances 'so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt.'" Id. at 380 (quoting Crawford, 470 S.W.2d at 612). Accordingly, the State is no longer required to "exclude every other reasonable hypothesis save the guilt of the defendant" to obtain a conviction based solely on circumstantial evidence and need only establish the constitutionally required standard of proof beyond a reasonable doubt. Id. at 381. Ultimately, how much weight to give circumstantial evidence and the extent to which such evidence is consistent with guilt or inconsistent with innocence are questions for the jury. Dorantes, 331 S.W.3d at 379; Smith v. State, 327 S.W.2d 308, 318 (Tenn. 1959).

Relevant to this case, felony murder is "a killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." Tenn. Code Ann. § 39-13-202(a)(2). Tennessee Code Annotated section 39-13-202 also provides that "[n]o culpable mental state is required for conviction under subdivision (a)(2) . . . except the intent to commit the enumerated offenses or acts." Tenn. Code Ann. § 39-13-202(b). Additionally, the death must occur "in the perpetration of" the enumerated felony. State v. Hinton, 42 S.W.3d 113, 119 (Tenn. Crim. App. 2000) (citations omitted). The killing may precede, coincide with, or follow the felony and still be in the perpetration of the felony, so long as there is a connection in time, place, and continuity of action. State v. Buggs, 995 S.W.2d 102, 106 (Tenn. 1999). If the underlying felony and killing were part of a continuous transaction with no break in the chain of events and the felon had not reached a place of temporary safety between the events, felony murder is sufficiently established. State v. Pierce, 23 S.W.3d 289, 294-97 (Tenn. 2000). Proof of the intention to commit the underlying felony and at what point it existed is a question of fact to be decided by the jury after consideration of all the facts and circumstances. Buggs, 995 S.W.2d at 107.

In this case, the underlying felony charged in the indictment is especially aggravated robbery. "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). Theft is defined as the following: "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103. To sustain a conviction for especially aggravated robbery, the evidence must establish that a defendant robbed the victim with a deadly weapon and that the victim suffered serious bodily injury. Tenn. Code Ann. § 39-13-403(a).

Under Tennessee law, the proof must show that the killings were committed during the perpetration of an especially aggravated robbery or the attempt to perpetrate an especially aggravated robbery. Relying on the elements of robbery, the crux of the Defendant's argument is that there was no proof of any theft of property. Specifically, he submits as follows:

> In this case, even taken in the light most favorable to the State, the only evidence of money being involved in these homicides is the single statement that [the Defendant] supposedly stated that he was going to get his money back. Therefore, under the State's own theory the owner of the money was [the Defendant]. The State must show "that the property is owned by someone other than the defendant." State v. Goins, 705 S.W.2d 648, 650 (Tenn. 1986). In this case, not only did the State not do that, the State even claimed that the property supposedly to be taken belonged to [the Defendant].

> Additionally, there is no evidence that [the Defendant] ever obtained or exercised control over anything at the time of the homicides. There was no evidence of anything being taken and none of the supposed confessions mentioned anything being recovered or removed from the residence.

While the testimony at trial varied and was at times contradictory, the following proof was before the jury for its consideration. The proof established that the Defendant had been beaten and robbed a week or two prior to the party in Sweetwater on February 12, 1999. In the early months of 2006, the Defendant visited Analesha Harper. When Ms. Harper was asked if, during this 2006 meeting, the Defendant ever told "who he thought had something to do with" that prior robbery, she replied, "When I asked him about the murders he was like the guy OJ, remember, that was the guy that I had the fight with[.]"

Several witnesses testified to a physical altercation between the Defendant and OJ Blair at Tamara Rhea's February 12, 1999 party. Reginald Constant testified that, after he "broke up" the fight between the Defendant and OJ Blair, the group heard gunshots while they were standing in the yard. The Defendant then pulled out his weapon and pointed it toward the porch. Mr. Constant attempted to intervene, and the Defendant said, "You are going to let them shoot at me and I can't shoot back[,]" before getting his vehicle and leaving. Desmond Deane Benton also testified that he saw the Defendant and OJ Blair involved in a physical fight at the party. According to Mr. Benton and Vanessa Latham, OJ Blair was winning the fight. Amy Lonas testified that the Defendant had a gun the night of the party and, when OJ Blair and Twanna Blair arrived at the party, the Defendant said, "They could die right there."

-12-

Ms. Lonas testified that the Defendant, Michael Younger, and Jason McGaughey, who were all intoxicated after the party, came to her apartment at 2:00 a.m. on February 13. Ms. Lonas and the Defendant had a conversation about where the Defendant was headed, and the Defendant told Ms. Lonas that "he was going to get his money back." Ms. Lonas then asked the Defendant "how much dope did you front him[,]" to which the Defendant replied that "it was none of [her] business." When Charles Brewster, Jr., saw the Defendant on Saturday afternoon after the party, the Defendant said to him "[t]hat he had handled the situation. He retaliated and handled the situation."

Around 2:00 a.m., on February 14, 1999, Stacy Ann Clabough left a club she was patronizing and went to the victims' townhouse to inquire why they had not come to the club. After knocking on the door, Twanna Blair answered and told her that everyone was asleep. As she was leaving the complex, she heard a noise that "caught [her] attention," and she turned and saw someone sitting inside a dark, maroon vehicle. She was able to later identity this individual as the Defendant.

After officers arrived on the scene in response to Twanna Blair's 911 telephone call, the three victims were found lying on the living floor of the townhouse, dead from gunshot wounds to the head and/or neck. Detective Eric Hampton observed that the kitchen door of the townhouse had been forcibly opened and that there were several items on the kitchen floor, including a knife, a cordless phone, and black wire "flex" ties.

Ranessa Macon stated that the Defendant came to her residence on Sunday morning February 14 and woke her up. After having her sit on the couch, the Defendant told her he had killed someone.

On February 15, Ms. Lonas again encountered the Defendant as she was taking out her trash about 7:00 or 8:00 a.m that morning. When talking about where he had been, the Defendant said that "he had took care of it, . . . that he went to go get his money back, . . . he had done something real bad, . . . he was going to have to go away for a little while." The Defendant described his arrival at the townhouse to Ms. Lonas: "Twanna knew he was coming, they knocked on the door like the police to get in the door, . . . that it was only OJ in that house." The Defendant told Ms. Lonas that OJ pulled a gun on him first so he had to shoot in "self-defense" and that OJ was still alive when he left the apartment. The Defendant threatened to kill Ms. Lonas if she ever told anyone.

Tamara Rhea spoke with the Defendant a few days after the shootings, and the Defendant was apologetic about fighting at the party. She asked him if he was involved in the murders, and the Defendant said, "You never know." Vanessa Latham also spoke with the Defendant after the murders. While they were "just chilling" in "Jake's parking lot," the

Defendant asked Ms. Latham if she knew "that guy from Cleveland," to which Ms. Latham responded affirmatively. The Defendant then said "we did that." Ms. Latham became upset because she believed one of the victims to be pregnant, and the Defendant told her that "the fucking bitch shouldn't have had her ass there[.]" The Defendant threatened to kill Ms. Latham if she ever spoke of this information to anyone.

Mark Blair testified that, while he was incarcerated, he spoke with the Defendant in February 1999 by telephone, and the Defendant told him "that he had killed some people." Mark Blair explained that, on another occasion, he and the Defendant were walking around the track at the jail and talking, when the Defendant informed him that, when he got out of jail, he was going "put down a demo[.]" Mark Blair replied, "When you get out, . . . them youngsters ain't going to let you come out there and regulate or nothing." The Defendant then said, "I ain't worried about what them youngsters think, . . . if they get in the way I will do them just like me and Money did down in Cleveland." Mark Blair testified that Michael Younger was also known as "Money." The Defendant told Mark Blair that he "handled the matter in Cleveland" after getting into a fight with OJ Blair at a party in Sweetwater.

Several years later, under pressure from the police, Ms. Latham agreed to call the Defendant while the police recorded the call. Detective Duff Brumley described the Defendant as "very reluctant to speak" and "evasive" in the first phone call. Detective Brumley then took Ms. Latham to a pay phone, where she placed another call to the Defendant. During this call, which was played for the jury, the Defendant stated, "Now, Vanessa, listening [sic] to what I'm saying. Regardless of what me and you talked about nobody is going to know but me and you. Do you understand that?"

In February 2006, Stacy Marvin King stopped to eat at an Applebee's restaurant in Athens, where he ran into the Defendant. Mr. King and the Defendant talked about the triple homicides in Cleveland, and the Defendant was "agitated with regard to the talk on the streets." The Defendant told Mr. King that he needed to "resolve a problem" that he had with Twanna Blair, who was still alive and "talking about" the murders. The Defendant also described the killings to Mr. King.

Citing to State v. Goins, 705 S.W.2d 648, 650 (Tenn. 1986), the Defendant argues that the State's trial theory encompassed the Defendant as the owner of the money he went to get from OJ Blair and, therefore, the State had failed to prove a theft, an element of robbery, the underlying felony. This Court has stated that "[i]t may be that the Goins court's comments about establishing the identity of a named owner were peculiarly related to the former offense of receiving and concealing; the court noted, 'The gravamen of the crime [is] the fact that the receiver knew that he was receiving stolen property.'" State v. March, 293 S.W.3d 576, 591

n.5 (Tenn. Crim. App. 2008) (quoting Goins, 705 S.W.2d at 650). Of great significance, for purposes of the theft of property and robbery statutes, our criminal Code defines the term "owner" as "a person, other than the defendant, who has possession of or any interest other than a mortgage, deed of trust or security interest in property, even though that possession or interest is unlawful and without whose consent the defendant has no authority to exert control over the property." Tenn. Code Ann. § 39-11-106(a)(26). Under this definition, OJ Blair is not required to be in lawful possession of the Defendant's money or drugs. Cf. State v. William C. Bentley, No. M2001-01521-CCA-R3-CD, 2002 WL 1336656, at *3 (Tenn. Crim. App., Nashville, June 19, 2002) (evidence was sufficient to support attempted aggravated robbery conviction even though Defendant alleged that the victim owed him money and that, therefore, he was the rightful owner of the money allegedly stolen, not victim). OJ Blair was in possession of the money and drugs, and the Defendant had no authority to exert control over the property. The Defendant is not entitled to relief on this issue.

Viewing the evidence in the light most favorable to the State, we conclude that there was sufficient evidence for any rational trier of fact to conclude that the Defendant murdered the three victims during the perpetration of an attempted especially aggravated robbery. The evidence established that the Defendant had been robbed prior to the party in Sweetwater, possibly by OJ Blair, and that the Defendant and OJ Blair got into a physical altercation at the party. The Defendant arrived at Ms. Lonas' apartment about 2:00 a.m. on the morning after the party and, as the Defendant was leaving, he told Ms. Lonas that he was headed to go "get his money from back" from OJ Blair, whom he had inferentially "fronted" some "dope." On February 14, 1999, the three victims were found deceased from gunshot wounds to the head and/or neck. Stacy Ann Clabough testified that she saw the Defendant in the parking lot of the townhouse complex around 2:00 a.m on February 14. On February 15, the Defendant again spoke with Ms. Lonas and told her that "he had took care of it, . . . that he went to go get his money back, . . . he had done something real bad, . . . he was going to have to go away for a little while." In addition to Ms. Lonas, the Defendant confessed to the murders to several other individuals. That is all the proof necessary to support the Defendant's three convictions for first degree felony murder, i.e., a killing of another committed in the perpetration of or attempt to perpetrate an especially aggravated robbery. See Tenn. Code Ann. § 39-13-202(a)(2).

However, we cannot conclude that the robbery progressed beyond an attempt. We must agree with the Defendant that "there is no evidence that [he] ever obtained or exercised control over anything at the time of the homicides." Detective Hampton testified that nothing inside the townhouse appeared to be "disarrayed or ransacked[.]" According to former TBI agent Raymond DePriest, agents always performed a thorough search of a crime scene looking for contraband, and agents did not find any evidence of controlled substances present

-15-

in the townhouse. TBI Special Agent Luke Mahonen described what he would typically look for at a crime scene: "One would have looked for items of value missing, items of value being present, ways that entry could have been made, whether the doors were locked or unlocked, signs of struggle, wallets, purses, things of that nature, currency, jewelry, things of value." However, Agent Mahonen did not recall whether any money was found at the scene. While the Defendant went to get his drugs and money back from OJ Blair, there is no proof that he ever did so.

The evidence is sufficient to support a conviction for the lesser included offense of attempted especially aggravated robbery, a Class B felony; however, prosecution of that offense is barred by the eight-year statute of limitations. See Tenn. Code Ann. § 40-2-101(b)(2). The Defendant objected to charging any lesser included offenses raising the statute of limitations as a defense. The State acquiesced in that request and made no argument for tolling of the the limitations period. Therefore, the Defendant's conviction for especially aggravated robbery is reversed and dismissed. The judgments and sentences on the Defendant's three murder convictions remain unaffected.[1]

## II. Prosecutorial Misconduct

Next, the Defendant submits that "the cumulative effect of the [d]istrict [a]ttorney's repeatedly improper conduct, requiring an abundance of objections by [d]efense counsel unfairly prejudiced the jury to the point that they were unable to render a proper verdict." The Defendant cites to two civil cases, Pullman Co. v. Pennock, 102 S.W.73 (Tenn. 1907), and Guess v. Maury, 726 S.W.2d 906 (Tenn. Ct. App. 1986), in support of his argument that the district attorney's inexcusable repeated violations of the rules in this case entitles him to a new trial.

The State argues that the Defendant has waived this issue by failing to raise it in his motion for new trial. We agree. Rule 3(e) of the Tennessee Rules of Appellate Procedure provides, in pertinent part, as follows:

> [I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new

---

[1] The fact that the underlying felony is barred by the statute of limitations is "entirely irrelevant." State v. Gribble, 655 S.W.2d 196, 198 (Tenn. Crim. App. 1993) (quoting People v. Harvin, 259 N.Y.S.2d 88, 884 (N.Y. App. Term 1965)). The charge for which the Defendant is being prosecuted is first degree felony murder for which there is no statute of limitations. Id.; see also Tenn. Code Ann. § 40-2-101(a).

-16-

trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.

This issue has been waived.  Moreover, the Defendant makes no argument that this Court should review this issue as plain error, and we see no reason to do so sua sponte.

## III.  Lead Detective Wrongdoing

Finally, the Defendant contends that "the discovery of wrongdoing by the prosecuting officer in the case taints the evidence in this case to the extent that the verdict should be set aside and a new trial granted."  The Defendant refers to allegations set forth in the State's Motion to Enter Nolle Prosequi in Michael Younger's case, which call into question the credibility of Det. Brumley.  The Defendant has already filed a motion with this Court asking us to consider as post-judgment facts the "admissions" of the district attorney in the motion in Younger's case.  The State argued in opposition to the motion that the assertions made by the prosecutor in the Younger case do not constitute post-judgment "facts" capable of consideration by this Court pursuant to Rule 14 of the Rules of Appellate Procedure.  We again find the State's position to be well-taken.  The Advisory Commission Comments of Rule 14 provide that the rule permits consideration of only those post-judgment facts "unrelated to the merits and not genuinely disputed" in order to "keep the record up to date," and "is not intended to permit a retrial in the appellate court.  See also State v. Roberts, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988) ("Allegations contained in pleadings are not evidence.").  The Defendant is not entitled to relief on this issue.

## Conclusion

For the reasons articulated above, we reverse and dismiss the Defendant's conviction for especially aggravated robbery.  In all other respects, the judgments of the Bradley County Criminal Court are affirmed.

_____
DAVID H. WELLES, SPECIAL JUDGE